KARNUTH, DIRECTOR OF IMMIGRATION, ET AL. *v.* UNITED STATES EX REL. ALBRO.

No. 198. Argued March 5, 1929.—Decided April 8, 1929.

*Attorney General Mitchell,* with whom *Messrs. Green H. Hackworth,* Solicitor, Department of State, *Richard W. Flournoy, Jr.,* Assistant Solicitor, *Theodore G. Risley,* Solicitor Department of Labor, *B. W. Butler* and *Albert E. Reitzel,* Assistants to the Solicitor, and *Frank M. Parrish* were on the brief, for petitioners.

*Mr. Preston M. Albro,* with whom *Mr. George W. Of-futt* was on the brief, for respondents.

MR. JUSTICE SUTHERLAND delivered the opinion of the Court.

This case arose under § 3 of the Immigration Act of 1924, c. 190, 43 Stat. 153, 154, U. S. Code, Title 8, § 203, *et seq.*, which provides: " When used in this Act the term 'immigrant' means any alien departing from any place outside the United States destined for the United States, except . . . (2) an alien visiting the United States temporarily as a tourist or temporarily for business or pleasure, . . ." The complete section, together with other pertinent provisions of the act, are copied in the margin.*

Neither respondent is a native of Canada. Mary Cook is a British subject, born in Scotland, who came to Canada in May, 1924. She is a spinner by occupation and resides at Niagara Falls, Ontario. Antonio Danelon

_____

* Sec. 3. When used in this Act, the term " immigrant " means any alien departing from any place outside the United States destined for the United States, except (1) a government official, his family, attendants, servants, and employees, (2) an alien visiting the United States temporarily as a tourist or temporarily for business or pleasure, (3) an alien in continuous transit through the United States, (4) an alien lawfully admitted to the United States who later goes in transit from one part of the United States to another through foreign contiguous territory, (5) a bona fide alien seaman serving as such on a vessel arriving at a port of the United States and seeking to enter temporarily the United States solely in the pursuit of his calling as a seaman, and (6) an alien entitled to enter the United States solely to carry on trade under and in pursuance of the provisions of a present existing treaty of commerce and navigation:

. Sec. 4. When used in this Act the term " non-quota immigrant " means—

. . .

(c) An immigrant who was born in the Dominion of Canada, Newfoundland, the Republic of Mexico, the Republic of Cuba, the Re-

is a native of Italy, who came to Canada in 1923. He also resides at Niagara Falls, Ontario. He alleges that he became a Canadian citizen by reason of his father's naturalization. Both sought admission to the United States on December 1, 1927, as non-immigrants under the excepting clause (2) above quoted. Prior thereto, Mary Cook had crossed from Canada to the United States daily for a period of three weeks to engage in work at which she was employed. On the occasion in question, she was out of employment, but desired admission to look for work. Danelon had been at work in the United States for more than a year, crossing daily by the use of an identification card. He sought admission to resume work. Both were denied admission by the immigration authorities, on the ground that they were quota-immigrants within the meaning of the act, and did not come within the excepting clause, § 3 (2). The following departmental regulation, adopted under § 24 of the act, has been in force since September, 1925. " Temporary visits . . . for the purpose of performing labor for hire are not considered to be within

---

public of Haiti, the Dominican Republic, the Canal Zone, or an independent country of Central or South America, and his wife, and his unmarried children under 18 years of age, if accompanying or following to join him;

. . .

Sec. 5. When used in this Act the term " quota immigrant " means any immigrant who is not a non-quota immigrant. An alien who is not particularly specified in this Act as a non-quota immigrant or a non-immigrant shall not be admitted as a non-quota immigrant or a non-immigrant by reason of relationship to any individual who is so specified or by reason of being excepted from the operation of any other law regulating or forbidding immigration.

Sec. 24. The Commissioner General, with the approval of the Secretary of Labor, shall prescribe rules and regulations for the enforcement of the provisions of this Act; but all such rules and regulations, in so far as they relate to the administration of this Act by consular officers, shall be prescribed by the Secretary of State on the recommendation of the Secretary of Labor.

the purview of section 3 (2) of the act." It is not disputed that both aliens were properly excluded if the validity of this regulation is established.

In a habeas corpus proceeding, brought in behalf of the two aliens, the federal district court for the Western District of New York sustained the action of the immigration officials and dismissed the writ. On appeal, this judgment was reversed. The circuit court of appeals held that an alien crossing from Canada to the United States daily to labor for hire was not an immigrant but a visitor for business within the meaning of section 3 (2) of the act. 24 F. (2d) 649. In reaching that conclusion the court seemed of opinion that if the statute were so construed as to exclude the aliens, it would be in conflict with Article III of the Jay Treaty of 1794, 8 Stat. 116, 117, a result, of course, to be avoided if, reasonably, it could be done. *Lem Moon Sing* v. *United States*, 158 U. S. 538, 549.

We granted the writ of certiorari because of the far-reaching importance of the question. The decision below affects not only aliens crossing daily from Canada to labor in the United States, but, if followed, will extend to include those entering the United States for the same purpose from all countries, including Canada, who intend to remain for any period of time embraced within the meaning of the word " temporary." By the immigration rules, this time is defined as a reasonable fixed period to be determined by the examining officer, which may be extended from time to time, though not to exceed one year altogether from the date of original entry. Thus, if the view of the court below prevail, it will result that aliens—not native of Canada or any other American country named in § 4 (c),—whose entry as immigrants is precluded, may land as temporary visitors and remain at work in the United States for weeks or months at a time.

*First.* The pertinent provision of Article III of the Jay Treaty follows:

"It is agreed that it shall at all times be free to his Majesty's subjects, and to the citizens of the United States, and also to the Indians dwelling on either side of the said boundary line, freely to pass and repass by land or inland navigation, into the respective territories and countries of the two parties, on the continent of America (the country within the limits of the Hudson's bay Company only excepted) and to navigate all the lakes; rivers and waters thereof, and freely to carry on trade and commerce with each other. ... ."

The position of the Government is that (1) there is no conflict between the treaty and the statute, but, (2) in any event, the treaty provision relied on was abrogated by the War of 1812. We pass at once to a consideration of the second contention; since if that be sustained the first becomes immaterial and the statute open to construction unembarrassed by the treaty.

The effect of war upon treaties is a subject in respect of which there are widely divergent opinions. The doctrine sometimes asserted, especially by the older writers, that war *ipso facto* annuls treaties of every kind between the warring nations, is repudiated by the great weight of modern authority; and the view now commonly accepted is that "whether the stipulations of a treaty are annulled by war depends upon their intrinsic character." 5 Moore's Digest of International Law, § 779, p. 383. But as to precisely what treaties fall and what survive, under this designation, there is lack of accord. The authorities, as well as the practice of nations, present a great contrariety of views. The law of the subject is still in the making, and, in attempting to formulate principles at all approaching generality, courts must proceed with a good deal of caution. But there seems to be fairly common agreement that, at least, the following treaty obligations remain in force: stipulations in respect of what shall be done in a state of war; treaties of cession, boundary, and the like;

provisions giving the right to citizens or subjects of one of the high contracting powers to continue to hold and transmit land in the territory of the other; and, generally, provisions which represent completed acts. On the other hand, treaties of amity, of alliance, and the like, having a political character, the object of which "is to promote relations of harmony between nation and nation," are generally regarded as belonging to the class of treaty stipulations that are absolutely annulled by war. *Id.,* p. 385, quoting Calvo, Droit Int. (4th Ed.), IV. 65, § 1931.

In *Society, etc.* v. *New Haven,* 8 Wheat. 464, a case involving the right of a British corporation to continue to hold lands in Vermont, this Court was called upon to determine the effects of the War of 1812 upon the Ninth Article of the Jay Treaty which provides "that British subjects who now hold lands in the territories of the United States, and American citizens who now hold lands in the dominions of his Majesty, shall continue to hold them according to the nature and tenure of their respective estates and titles therein; and may grant, sell, or devise the same to whom they please, in like manner as if they were natives; and that neither they nor their heirs or assigns shall, so far as may respect the said lands and the legal remedies incident thereto, be regarded as aliens." 8 Stat. 116, 122.

It was held that the title to the property of the Society was protected by the Sixth Article of the Treaty of 1783, 8 Stat. 80, 83; was confirmed by the words of Article IX above quoted; and was not affected by the War of 1812. The applicable rule was stated (p. 494) in the following words:

"But we are not inclined to admit the doctrine urged at the bar, that treaties become extinguished, *ipso facto,* by war between the two governments, unless they should be revived by an express or implied renewal on the return of peace. Whatever may be the latitude of doctrine laid

down by elementary writers on the law of nations, dealing in general terms in relation to this subject, we are satisfied, that the doctrine contended for is not universally true. There may be treaties of such a nature, as to their object and import, as that war will put an end to them; but where treaties contemplate a permanent arrangement of territorial, and other national rights, or which in their terms, are meant to provide for the event of an intervening war, it would be against every principle of just interpretation to hold them extinguished by the event of war. If such were the law, even the treaty of 1783, so far as it fixed our limits, and acknowledged our independence, would be gone, and we should have had again to struggle for both upon original revolutionary principles. Such a construction was never asserted, and would be so monstrous as to supersede all reasoning. We think, therefore, that treaties stipulating for permanent rights, and general arrangements, and professing to aim at perpetuity, and to deal with the case of war as well as of peace, do not cease on the occurrence of war, but are, at most, only suspended while it lasts; and unless they are waived by the parties, or new and repugnant stipulations are made, they revive in their operation at the return of peace."

The English High Court of Chancery reached the same conclusion in *Sutton* v. *Sutton*, 1 Russ. & M. 663, 675:

" The relations, which had subsisted between Great Britain and America, when they formed one empire, led to the introduction of the ninth section of the treaty of 1794, and made it highly reasonable that the subjects of the two parts of the divided empire should, notwithstanding the separation, be protected in the mutual enjoyment of their landed property; and, the privileges of natives being reciprocally given, not only to the actual possessors of lands, but to their heirs and assigns, it is a reasonable construction that it was the intention of the treaty that

the operation of the treaty should be permanent, and not depend upon the continuance of a state of peace."

These cases are cited by respondents and relied upon as determinative of the effect of the War of 1812 upon Article III of the treaty. This view we are unable to accept. Article IX and Article III relate to fundamentally different things. Article IX aims at perpetuity and deals with existing rights, vested and permanent in character, in respect of which, by express provision, neither the owners nor their heirs or assigns are to be regarded as aliens. These are rights which, by their very nature, are fixed and continuing, regardless of war or peace. But the privilege accorded by Article III is one created by the treaty, having no obligatory existence apart from that instrument, dictated by considerations of mutual trust and confidence, and resting upon the presumption that the privilege will not be exercised to unneighborly ends. It is, in no sense, a vested right. It is not permanent in its nature. It is wholly promissory and prospective and necessarily ceases to operate in a state of war, since the passing and repassing of citizens or subjects of one sovereignty into the territory of another is inconsistent with a condition of hostility. See 7 Moore's Digest of International Law, § 1135; 2 Hyde, International Law, § 606. The reasons for the conclusion are obvious—among them, that otherwise the door would be open for treasonable intercourse. And it is easy to see that such freedom of intercourse also may be incompatible with conditions following the termination of the war. Disturbance of peaceful relations between countries occasioned by war, is often so profound that the accompanying bitterness, distrust and hate indefinitely survive the coming of peace. The causes, conduct or result of the war may be such as to render a revival of the privilege inconsistent with a new or altered state of affairs. The grant of the privilege con-

notes the existence of normal peaceful relations. When these are broken by war, it is wholly problematic whether the ensuing peace will be of such character as to justify the neighborly freedom of intercourse which prevailed before the rupture. It follows that the provision belongs to the class of treaties which does not survive war between the high contracting parties, in respect of which, we quote, as apposite, the words of a careful writer on the subject:

"Treaties of the fifth class are necessarily at least suspended by war, many of them are necessarily annulled, and there is nothing in any of them to make them revive as a matter of course on the advent of peace,—frequently in fact a change in the relations of the parties to them effected by the treaty of peace is inconsistent with a renewal of the identical stipulations. It would appear therefore to be simplest to take them to be all annulled, and to adopt the easy course, when it is wished to put them in force again without alteration, of expressly stipulating for their renewal by an article in the treaty of peace." Hall, International Law (5th Ed.), pp. 389–390.

Westlake classifies treaties not affected by war as (1) those providing what is to be done in a state of war, (2) transitory or dispositive treaties, including such as are intended to establish a permanent condition of things, such as treaties of cession, boundary, and recognition of independence, as well as those having no conceivable connection with the causes of war or peace, and (3) treaties establishing arrangements to which third powers are parties such as guarantees and postal and other unions. Westlake, International Law, Part II, pp. 29–32. He then says:

"Outside the exceptions which have been discussed, treaties between belligerents do not survive the outbreak of the war. At the peace there is no presumption that the parties will take the same view as before the war of their interests, political, commercial or other. It is for

them to define on what terms they intend to close their interlude of savage life and to reënter the domain of law."

Fauchille, Traité de Droit International Public, 1921, Vol. II, p. 55, says that " a state of war puts an end to treaties concluded with a view to peaceful relations between the signatories and the object or end of which is to strengthen or maintain such peaceful relations, for example, treaties of alliance, subsidies, guarantees, commerce, navigation, customs union, etc. Those treaties from their very nature are subject to an implicit resolutory condition, namely a break in the state of peace. They cannot survive the outbreak of hostilities between the signatory States. War, to them, is a cause of final extinction and not of mere suspension. When peace is concluded, they do not spontaneously come out of a comatose state; they do not revive unless expressly renewed in the peace treaty."*

These expressions and others of similar import which might be added, confirm our conclusion that the provision of the Jay Treaty now under consideration was brought to an end by the War of 1812, leaving the contracting powers discharged from all obligation in respect thereto, and, in the absence of a renewal, free to deal with the matter as their views of national policy, respectively, might from time to time dictate.

---

* . . . *résolus* par l'état de gurre les traités conclus en vue de relations pacifiques entre les signataires et ayant pour objet ou pour but la consolidation ou le maintien de ces relations pacifiques. *Ex.:* les traités d'alliance, de subsides, de garantie, de commerce, de navigation, d'union douanière, etc. Ces traités sont par leur nature même affectés d'une condition résolutoire implicite, la cessation de l'état de paix. Ils ne peuvent survivre à l'ouverture des hostilités entre les Etats signataires. La guerre est pour eux une cause d'extinction définitive, et non une cause de simple suspension. La paix conclue, ils ne sortent pas spontanément, d'un état de léthargie momentané: ils ne revivent pas, à moins qu'ils no soient expressément renouvelés dans le traité de paix.

We are not unmindful of the agreement in Article XXVIII of the Treaty "that the first ten articles of this treaty shall be permanent, and that the subsequent articles, except the twelfth, shall be limited in their duration to twelve years." It is quite apparent that the word "permanent" as applied to the first ten articles was used to differentiate them from the subsequent articles—that is to say, it was not employed as a synonym for "perpetual" or "everlasting," but in the sense that those articles were not limited to a specific period of time, as was the case in respect of the remaining articles. Having regard to the context, such an interpretation of the word "permanent" is neither strained nor unusual. See *Texas, &c. Railway Co.* v. *Marshall,* 136 U. S. 393, 403; *Bassett* v. *Johnson,* 2 N. J. Eq. 154, 162.

It is true, as respondents assert, that citizens and subjects of the two countries continued after the War of 1812, as before, freely to pass and repass the international boundary line. And so they would have done if there never had been a treaty on the subject. Until a very recent period, the policy of the United States, with certain definitely specified exceptions, had been to open its doors to all comers without regard to their allegiance. This policy sufficiently accounts for the acquiescence of the Government in the continued exercise of the crossing privilege upon the part of the inhabitants of Canada, with whom we have always been upon the most friendly terms; and a presumption that such acquiescence recognized a revival of the treaty obligation cannot be indulged.

*Second.* In construing § 3 (2) of the Immigration Act, we are not concerned with the ordinary definition of the word "immigrant" as one who comes for permanent residence. The act makes its own definition, which is that "the term 'immigrant' means any alien departing from any place outside the United States destined for the United States." The term thus includes every alien com-

ing to this country either to reside permanently or for temporary purposes, unless he can bring himself within one of the exceptions. The only exception pertinent to the present case is the second, quoted at the beginning of this opinion, namely, an alien visiting the United States "temporarily for business or pleasure." The contention is that respondents were temporary visitors for business; and the case is, therefore, narrowed to the simple inquiry whether the word "business," as used in the statute, includes ordinary work for hire. The word is one of flexibility; and, when used in a statute, its meaning depends upon the context or upon the purposes of the legislation. It may be so used as either to include or exclude labor; "for though labor may be business, it is not necessarily so, and the converse is equally true, that business is not always labor." *Bloom* v. *Richards,* 2 Oh. St. 387, 396. The true sense in which the word was here employed will be best ascertained by considering the policy, necessity and causes which induced the enactment. See *Heydenfeldt* v. *Daney Gold, etc. Co.,* 93 U. S. 634, 638; *Holy Trinity Church* v. *United States,* 143 U. S. 457, 463; *Ozawa* v. *United States,* 260 U. S. 178, 194.

The various acts of Congress since 1916 evince a progressive policy of restricting immigration. The history of this legislation points clearly to the conclusion that one of its great purposes was to protect American labor against the influx of foreign labor. In the report of the House Committee to accompany the bill which became the Quota Act of May 19, 1921 (H. of R. Report 4, 67th Congress, 1st Session), it was stated (p. 3) that one of the causes which called for the immediate passage of an act to restrict immigration was: "2. Large unemployment in the United States, making it impracticable for the United States to accept a heavy immigration." And further (p. 7): "In the opinion of a majority of the members of this commit-

tee the economic aspects of immigration alone call for the passage of this restrictive legislation, if there were no other reasons." In the Senate report upon the same bill (S. Report 17, 67th Congress, 1st Session, p. 4) one of the evils pointed out was that a large part of the new immigration had been of a migratory character, immigrants coming to the United States not so much for the purpose of permanent residence as to seek temporary profitable employment. The report of the House Committee to accompany the bill which afterwards became the Act of 1924, now under consideration, (H. of R. Report 350, 68th Congress, 1st Session) likewise makes clear that protection of American labor was one of the controlling reasons for further restriction of immigration. The committee, after pointing out that various suggested plans for admitting laborers and farmers had been rejected, said (p. 22): " As has been so often said with reference to the demand for the admission of laborers, the present gain is not worth the future cost."

In view of this definite policy, it cannot be supposed that Congress intended, by admitting aliens temporarily for business, to permit their coming to labor for hire in competition with American workmen, whose protection it was one of the main purposes of the legislation to secure.

The word " business," as here used, must be limited in application to intercourse of a commercial character; and we hold that the departmental regulation, to the effect that temporary visits for the purpose of performing labor for hire are not within the purview of § 3 (2) of the act, is in accordance with the Congressional intent.

*Judgment reversed.*