## GOLDSMITH v. UNITED STATES.
### No. 240.

Circuit Court of Appeals, Second Circuit.
May 5, 1930.

134

H. Ely Goldsmith, of Windsor, Ontario, Canada (Charles G. F. Wahle, of New York City, of counsel), for appellant.

Charles H. Tuttle, U. S. Atty., of New York City (Robert E. Manley, of New York City, of counsel), for the United States.

Before MANTON, L. HAND, and CHASE, Circuit Judges.

MANTON, Circuit Judge.

The appellant was convicted of a violation of section 28, United States Criminal Code (USCA title 18, § 72). This section makes it a crime to "falsely make, alter, forge, or counterfeit, or cause or procure to be falsely made, altered, forged, or counterfeited, or willingly aid, or assist in the false making, altering, forging, or counterfeiting, any bond, bid, proposal, contract, guarantee, security, official bond, public record, affidavit, or other writing for the purpose of defrauding the United States; or shall utter or publish as true, or cause to be uttered or published as true, or have in his possession * * * or * * * transmit to, or present at, or cause or procure to be transmitted to, or presented at, the office of any officer of the United States, any such false, forged, altered, or counterfeited bond, bid, proposal, contract, guarantee, security, official bond, public record, affidavit, or other writing, knowing the same to be false, forged, altered, or counterfeited, for the purpose of defrauding the United States. * * *"

Appellant was charged with having, on the 19th of January, 1928, unlawfully, willfully and knowingly, transmitted or caused to be transmitted by the Post Office establishment of the United States to the American consul at Buenos Aires, Argentine, South America, a false, forged and counterfeited writing purporting to be a genuine letter, dated January 5, 1928, of the Consolidated Petroleum Corporation, of New York; it is

said that he knew the writing to be false, forged, and counterfeited, and that he intended to defraud the United States in the exercise of its governmental powers and duties by frustrating the administration of the Immigration Act of 1924 (8 USCA §§ 145, 146, 166, 167, 179, 201–226, 229), and the rules and regulations prescribed in reference thereto for the enforcement of the provisions of the Immigration Act, by inducing the consul to accept the letter as genuine and its contents as true and cause him to duly visa and authenticate the passport or official documents in the nature of a passport for one Wolf Galiks, an alien, so that he might be admitted to the United States temporarily for business as a nonimmigrant. In support of this charge, there was evidence to justify the jury's verdict that the writing was false, forged, and counterfeited, that the defendant knew it to be such, and that he either transmitted it or caused it to be transmitted to the American consul, and that he did so for the purpose of defrauding the United States. The Immigration Act which regulated Galiks' admission temporarily to the United States is section 3 and section 15 of the Act of 1924 (43 Stat. 154, 162, 8 USCA §§ 203, 215), which provides that the term "immigrant" means an alien departing from any place outside the United States and destined to the United States, except an alien visiting the United States temporarily as a tourist or temporarily for business or pleasure.

The appellant was employed to secure the admission of Galiks from the Argentine into the United States, and sought to do so under the provisions of this act. Galiks' father resided in the United States, as did a young lady whom he intended to marry. Galiks' father was advised to employ the appellant, and he in turn recommended the alien's friend to secure appellant's aid. The first interview pertaining to this mission was between appellant and Galiks' father, at which time appellant advised that he could secure a position in an oil company for the alien at a salary of $50 a week, and therefore he could come temporarily to this country and marry his intended wife. She had become an American citizen, and it was planned that after the marriage he could temporarily depart and return and then remain here permanently. Prior to the promise of a position, the appellant learned the occupation of Galiks at Campagna, Argentine, to be an employee of an oil company. For securing the position, the appellant asked $150, to be paid in installments. Thereafter appellant met Galiks' intended wife in Philadelphia at a hotel, by appointment, where he repeated his scheme of securing the admission of the alien, stating that, if she married him, he would procure for the alien "a visa to remain in this country" because she, being a citizen about to marry, would "automatically give him permission to remain here." She paid the appellant some money. A few days later, Galiks' intended wife met the appellant at her home in Philadelphia, and he showed her two letters "which he told me were affidavits permitting the boy to come here to Philadelphia." One was directed to the American consul in Buenos Aires and the other to the alien. He told her the letter from the company was an offer of $50 a week for the alien while employed by the company and that the other letter would give him a visa to come to this country. He advised her it was necessary to send $200 for traveling expenses, and this money was later paid by the alien's father. Exhibit 1 is a letter addressed to the alien c/o Cia Nacional de Petroleos Compana F. C. C. A., Buenos Aires, Argentine. It is dated January 5, 1928, and purports to have been written by the Consolidated Petroleum Company; it is typed and signed in ink by one W. D. Harper, as treasurer of the company. Exhibit 2 is the writing which is the subject of the indictment. It is a letter addressed to the American consul at Buenos Aires, dated January 5, 1928, and purports to have been written by the Consolidated Petroleum Company, offering a position to the alien. There is testimony that the Consolidated Petroleum Company made no such offer of a position, W. D. Harper was not its treasurer, and the company never intended to employ Galiks, and that the suggestion of the letter, that it wanted him to come to this country to discuss the possibility of his becoming its agent in Buenos Aires and the neighborhood, was false. The letter to the consul inclosed a draft of $200 to pay the expenses of the alien in coming to the United States. It stated that the corporation would give a bond that Galiks would leave the United States and would not become a public charge and would give him a sufficient allowance to pay his expenses while in the United States; that he would be here about three months to familiarize himself with the business. Appellant dictated a letter to Galiks' intended wife to send to him advising what to say to the American consul when he made his application for permission to come as a nonimmigrant, the details of which are not necessary to state here,

other than to say that it told him to repeat the terms of employment and that he was only on a temporary visit to the United States. The draft for $200 was purchased by appellant's clerk with the money paid by the alien's father. From the evidence, the jury was justified in finding that the appellant purchased the draft through his clerk, put it in the letter, and that the letter was sent through the mails and was received at the office of the American consul in the Argentine. The draft was sent to the American consul as payee, by the Consolidated Petroleum Company as the sender. There is evidence to show that at one time the appellant had access to letterheads and envelopes of the Consolidated Petroleum Company for whom he did accounting in 1925 and 1926. The corporation ceased doing business in the summer of 1927. It never had interests in the Argentine or contiguous territory, but its operations and oil wells were in the western part of this country. William Harper, Jr., was once president of the consolidated company. No William D. Harper was ever connected with the company. William Harper, Jr., was never treasurer of the corporation; he was treasurer of a subsidiary company. The signatures on Exhibits 1 and 2 were not in his handwriting. This evidence required the trial judge to submit the issues to the jury. Our sole purpose is to inquire whether there was any competent evidence which warranted the verdict. Powell v. United States (1924 C. C. A.) 2 F.(2d) 47; Talmadge v. United States (1925 C. C. A.) 4 F.(2d) 378.

It is argued that the evidence did not warrant submitting to the jury the question of whether or not appellant sent the letter with the signature thereon. But the letter was shown by appellant in his interview with the alien's intended wife in Philadelphia, although the signature "William D. Harper" was not upon it then. It is of no importance when the name "William D. Harper" was placed thereon. The appellant caused it to be written. The letter was false, forged, and counterfeited before the ink signature of William D. Harper was placed thereon. It was placed in the mails either by the appellant or some one acting for him, and transmitted through the mails to the American consul at Buenos Aires.

Appellant argues that the alien was not to stay in the United States permanently, but that the alien and, when married, his wife, would return to the Argentine. There is testimony to the contrary, and that appellant said they might remain here permanently.

■ The United States was defrauded by the attempt at frustrating the proper administration of the Immigration Act and the rules and regulations of the Department of Labor and of State. By inducing the consul, using the forged letter, to visa the passport of the alien, the consul, accepting the letter as true, would classify the alien as a nonimmigrant coming to the United States temporarily for business. If the truth were known to him, he would not classify him as such. The appellant's purpose involved defrauding the United States in the proper administration of the act, the regulations, and executive order of the President, which require a passport visa as a condition precedent to the admission of a nonimmigrant to this country. Immigration Act of 1924, § 2, subd. (f), 43 Stat. 154, 8 USCA § 202(f); Rule 3 of the Rules of March 1, 1927; Presidential Order 4476 of July 12, 1926. A fraud against the United States does not necessarily mean a loss of money or property. A fraud may be shown by some unlawful activity engaged in for the purpose of frustrating the proper administration of law or to impair the functions of government. Hammerschmidt v. United States (1924) 265 U. S. 182, 44 S. Ct. 511, 68 L. Ed. 968; United States v. Plyler (1911) 222 U. S. 15, 32 S. Ct. 6, 56 L. Ed. 70; Miller v. United States (1928 C. C. A.) 24 F.(2d) 353; Falter v. United States (1928 C. C. A.) 23 F.(2d) 420; United States v. Tynan (1923 D. C.) 6 F.(2d) 668.

■ Aliens who are not within the exceptions of section 3 of the 1924 Immigration Act are immigrants and those within section 3 are nonimmigrants. Visas are required for immigrants in order to entitle them to enter the United States. The Act of 1924 does not specifically set forth the requirements of admitting nonimmigrants, except that in section 15 (8 USCA § 215) it is provided that the admission of aliens, excepted from the immigration class, "shall be for such time as may be by regulations prescribed, and under such conditions as may be by regulations prescribed. * * *" Since the war, the United States has exercised passport control. Act of May 22, 1918 (40 Stat. 559, 22 USCA §§ 223–226). This conferred on the President, when the United States was at war, the duty to prescribe rules and regulations concerning the entry of persons into and their departure from the United States. This act was extended by the Act of March 2, 1921 (41 Stat. 1217, 22 USCA § 227) which con-

tained a provision that "the provisions of the Act approved May 22, 1918, * * * shall, in so far as they relate to requiring passports and visas from aliens seeking to come to the United States, continue in force and effect until otherwise provided by law." 41 Stat. 1217, 22 USCA § 227. Thus there were retained in the 1921 act regulations as to all classes of aliens. However, the act of 1918, with respect to aliens of nonimmigrant classes as defined by the act of 1924, is still in effect. Takeyo Koyama v. Burnett (1925, C. C. A.) 8 F. (2d) 940. A nonimmigrant temporary visitor who obtains a passport must have it visaed by the consular officer. Aliens of the immigrant class require immigration visas. In order to prevent disqualified aliens from being admitted, the government has adopted a system requiring passports to be visaed or immigration visas to be granted abroad through our consular agents. This is to prevent an alien who is ineligible for admission starting for the United States. The act of 1924 did not repeal or modify any of the prior immigration statutes prescribing eligibility for admission to the United States. It added quota restrictions on immigration. Section 25 (8 USCA § 223); subdivision (d) of section 2 of the Act of 1924 (8 USCA § 202(d). The Passport Control Act of 1918, as continued by the Act of March 2, 1921, is recognized as an immigration law by section 28, par. (g), of the 1924 act (43 Stat. 168, 8 USCA § 224 (f). As thus recognized, considered with its provisions and the executive orders and regulations based thereon concerning nonimmigrants, as an aid to the enforcement of the 1924 act dealing with quota immigrants (since the immigration laws are taken together), it all constitutes one well-defined system of dealing with immigrants and nonimmigrants. The rules of the Department of Labor of March 1, 1927, the Executive Order of July 12, 1926, and the Regulations of the State Department contained in General Instructions of the Department of State of September 30, 1925, require passport visas before a nonimmigrant may enter the United States. Thus Rule 3 of the Immigration Rules provides (paragraph 2) "no alien shall be admitted to the United States as a nonimmigrant unless such alien shall present to the proper immigration official at the port of arrival a passport * * * duly visaed and authenticated by an American consular officer." The Executive Order of July 12, 1926, has the same provisions. The possession of a passport visa is therefore a condition precedent to entry into the United States of a nonimmigrant. U. S. ex rel.

Komlos v. Trudell (1929 C. C. A.) 35 F.(2d) 281; U. S. ex rel. Graber v. Karnuth (1929 C. C. A.) 30 F.(2d) 242; United States ex rel. London v. Phelps (1927 C. C. A.) 22 F. (2d) 288. Appellant, by the use of forged letters, attempted to bring this alien within one of the exceptions of section 3 of the 1924 act (8 USCA § 203). Since the alien did not come within the exceptions, he was an immigrant under the 1924 act. Karnuth v. U. S. ex rel. Albro (1929) 279 U. S. 231, 49 S. Ct. 274, 73 L. Ed. 677.

It is argued that Exhibit 2, the letter addressed to the American consul, was not within section 28 of the U. S. Criminal Code (18 USCA § 72). The history of the statute dealing with this subject will be found in the footnote.[1] Section 28, directly derived from section 5418 and section 5479 of the Revised Statutes, enumerates the same writings as contained in those sections and adds the word "contract" after the word "proposal," so that word is the only addition since the enactment of the basic act. In United States v. Plyler (1911) 222 U. S. 15, 32 S. Ct. 6, 56 L. Ed. 70, the court considered section 5418 of the Revised Statutes and held that forging written vouchers, required upon examination by the Civil Service Commission, and presenting such vouchers to the commissioners, came within the section. The voucher was not a writing required to be sworn to.

It is argued that, under the rule of construction of ejusdem generis, Exhibit 2 cannot be included within the words of section 28 (18 USCA § 72) as "other writing." This rule of construction is not resorted to if the intention of the statute is clear, for it must govern. We may not read something into the statute which is not there. The rule of ejusdem generis means that, where a general term in the statute follows specific words of a like nature, it takes its meaning from the latter, and is presumed to embrace persons or things of the kind designated by the specific words. Words and Phrases, First Series, vol. 3, p. 2328; Central of Ga. R. Co. v. State (1906) 145 Ala. 99, 40 So. 991; Jones v. State (1912) 104 Ark. 261, 149 S. W. 56, Ann. Cas. 1914C, 302. Section 28 (18 USCA § 72) refers in general words to "any bond, bid, proposal, contract, guaran-

[1] Act March 3, 1823, 3 Stat. 771, c. 38; Act April 5, 1866, 14 Stat. 12, c. 24, § 1; Act June 8, 1872, 17 Stat. 321, c. 335, § 294; section 5418 of the Revised Statutes derived from the Act of April 5, 1866; section 5479 of the Revised Statutes derived from the Act of June 8, 1872; section 5421 of the Revised Statutes derived from the Act of March 3, 1823.

tee, security, official bond, public record, affidavit, or other writing." These writings referred to are unlike in meaning and specify different subjects. Many of them embrace all objects of their class, and indicate a different meaning from the preceding specific words. United States v. Lawrence (1875), 13 Blatchf. 211, 26 Fed. Cas. page 878, No. 15572; United States v. Staats (1850) 8 How. (49 U. S.) 41, 12 L. Ed. 979. In United States v. Davis (1913) 231 U. S. 183, 34 S. Ct. 112, 113, 58 L. Ed. 177, the court considered section 29 of the Criminal Code (18 USCA § 73), which makes it a crime to falsely make, alter, forge, or counterfeit deeds or other writings to obtain money from the United States, and the argument was made that the section did not include the affidavit, assignment, written guaranty, and instrument set forth in the counts of the indictment; that the subject of a soldier's additional homestead was governed by sections 2306, 2307, of the Revised Statutes (43 USCA §§ 274, 278), and under them no affidavits of any kind are required; and that the affidavit of the claimant there considered was unofficial in character and initiated no right to any tract of land, being a mere ex parte declaration under oath by persons having no official relation with the government; that the instruments, being unknown to the law, cannot be made the basis of a criminal offense and therefore a proper construction under the Criminal Code did not include the instruments contained in the indictment; that, even if there were rules and regulations of the Land Department providing for such instruments, still, as they were not authorized by any law of the United States, such requirements could not remain the basis of a criminal offense. The court answering these arguments said that the all-embracing words, "any deed, power of attorney, order, certificate, receipt, or other writing in support of or in relation to any account or claim with intent to defraud the United States, knowing the same to be false, altered, forged, or counterfeited," leave room for no conclusion other than that it was apparent that the provisions of the section were so comprehensive as to hold that they include all documents which are forged and counterfeited and used for fraudulent purposes against the United States. The court said: "The context of the section reinforces this view, since the contrast between the narrow scope of the first two paragraphs and the enlarged grasp of the third shows the legislative intent, after fully providing in the first two paragraphs for forged and counterfeited documents, instruments, etc., to reach by the provisions of the third paragraph, any and all fraudulent documents, whether forged or not forged, and thus efficiently to deter from committing the wrong which it was the purpose of the section to prohibit." 231 U. S. 183, 188, 34 S. Ct. 112, 113, 58 L. Ed. 177. And, referring to the argument of the defendant, said: "But without going into detail on this subject, we content ourselves with saying that, in our opinion, all the propositions relied upon to sustain this result are so obviously unsound, or so plainly concern the construction of the indictment, as not to call for particular notice." 231 U. S. 183, 189, 34 S. Ct. 112, 113, 58 L. Ed. 177. Giving their true meaning to them, the words, "any * * * other writing," in section 28 (18 USCA § 72) have been held to include and import entry and an owner's oath in United States v. Lawrence, supra; a voucher questionnaire or a medical certificate in United States v. Plyler, supra; a receipt for money in Howgate v. United States (1895) 7 App. D. C. 217; an assignment in United States v. Davis, supra; a homestead application in United States v. McKinley (1903 C. C.) 127 F. 166; and a declaration sheet in United States v. Bunting (1897 D. C.) 82 F. 883; and a physician's prescription in United States v. Tynan (1923 D. C.) 6 F.(2d) 668. These were writings containing statements of fact to influence government officials and used for a purpose similar to that made of Exhibit 2 by appellant. Appellant's act is within the condemnation of the statute.

Error is assigned in the admission in evidence of a conversation between the alien and the American consul at Buenos Aires. This conversation was admitted as competent to show appellant's purpose of defrauding. Appellant had made the alien his agent to make statements to the consul. This agency he established by the letter he advised alien's intended wife to write, and he dictated the substance to be written, advising the alien what to say to the consul when he applied for a visa. Moreover, he sent him the forged oil company letter, Exhibit 1, telling him "to see the American Consul immediately about your travelling papers." He made the same use of Exhibit 2. It appears that the appellant advised the alien in this correspondence what to say in answer to any inquiry that might be made as to how the alien came to know the Consolidated Petroleum Company. When this conversation took place, the alien had come with the letter Exhibit 1, and the consul had received the letter, Exhibit 2.

What the alien told the consul was, in substance, the information suggested in the letters. The rule of the binding effect of an agent's statements is, as applicable in criminal prosecution as in civil cases. United States v. Gooding (1827) 12 Wheat. (25 U. S.) 460, 6 L. Ed. 693. Whatever the agent did in reference to the business of the appellant in attempting to defraud the United States by misstatements to the consul and the use of the letter is binding upon him. Cliquot's Champagne (1865) 3 Wall. (70 U. S.) 114, 18 L. Ed. 116; American Fur Co. v. United States (1829) 2 Pet. (27 U. S.) 358, 7 L. Ed. 450; Hamburg-Amer. Steam Packet Co. v. United States (1918 C. C. A.) 250 F. 747. The letter which had been written to Galiks by his intended wife was destroyed by him, and the contents were testified to by him as secondary evidence. Had the letter been produced, and not destroyed, it would have been competent evidence of the appellant's purpose to defraud. The contents were testified to by the sender of the letter, who wrote it at appellant's dictation. The evidence was competent and properly received.

Other errors assigned have been examined, but we find the trial free from prejudicial and therefore reversible error.

Judgment affirmed.