[Civ. No. 15604.   First Dist., Div. One.   June 21, 1954.]

HERBERT BROWNELL, JR., as Attorney General of United States, Respondent, v. THE CITY AND COUNTY OF SAN FRANCISCO, Appellant.

Dion R. Holm, City Attorney, Thomas M. O'Connor and Richard Saveri, Deputy City Attorneys, for Appellant.

Dallas S. Townsend, Assistant United States Attorney General, Lloyd H. Burke, United States Attorney, Valentine C. Hammack, Special Assistant to United States Attorney General, James D. Hill, George B. Searls, Mary Eschweiler, Attorneys, Office of Alien Property, Department of Justice, for Respondent.

WOOD (Fred B.), J.—The Attorney General of the United States, as successor to the Alien Property Custodian, brought this action against the city and county of San Francisco for the recovery of taxes for the years 1941-1948, inclusive. These taxes, which he had paid under protest, were levied upon improved real property in San Francisco which the German government owned from April, 1941, to September, 1947, when title was vested in the United States. The Treaty of 1923 between Germany and the United States exempted from taxation the lands and buildings of either nation situate in the territory of the other if used exclusively for governmental

purposes of the owner. Judgment was rendered in favor of the plaintiff.

In support of its appeal defendant claims: (1) the applicable tax exemption provision of the treaty was suspended or abrogated by the outbreak of war in December, 1941; (2) said tax provision was suspended or abrogated by congressional enactment and by presidential or executive action incompatible with its enforcement; (3) a finding that the premises were used by the German government for consular purposes during 1941-1947 is not supported by the evidence; and (4) the tax exemption, if any existed theretofore, terminated when title was vested in the United States in September, 1947.

### The Tax Exemption Provision

The applicable tax provision of the treaty reads as follows: "Lands and buildings situated in the territories of either High Contracting Party, of which the other High Contracting Party is the legal or equitable owner and which are used exclusively for governmental purposes by that owner, shall be exempt from taxation of every kind, National, State, Provincial and Municipal, other than assessments levied for services or local public improvements by which the premises are benefited." (Treaty between the United States and Germany, signed December 8, 1923, proclaimed October 14, 1925; 44 Stats. 2132, art. XIX, 2149.)

### The Facts

The property consists of a three-story residence and the land upon which it stands. The German government acquired title April 29, 1941, and used the property as official quarters of its Consulate General in San Francisco until about July 14, 1941, when pursuant to Executive Order of the President of the United States all German consular establishments in American territory were closed.

The property was thereupon placed in charge of a caretaker for the German government who remained on the property until the outbreak of World War II between our country and Germany. The Consulate of Switzerland then took over supervision of the property as the representative of the German government and continued such supervision until June, 1945, when our Department of State assumed control pursuant to protocol entered into with the Swiss government. In July, 1947, the State Department released control to the Office of Alien Property of the Department of Justice for vesting purposes.

From the time when the consular agents left San Francisco in 1941 until the date of vesting, September 4, 1947, office equipment, furniture and materials were stored on the premises. There is evidence that until after our Secretary of State assumed control of the property, there were stored on the premises various books, documents, and files of the records and archives of the Consulate General at San Francisco.

### DISCUSSION AND OPINION

(1) *Was this tax exemption provision of the treaty suspended or abrogated by the declaration of war between Germany and the United States in December, 1941?*

Not necessarily, for it has already been determined that a clause of this treaty which accords to the nationals of each country the right to inherit real property in the territory of the other was not suspended or abrogated by that declaration of war nor by the hostilities which ensued. (*Clark* v. *Allen,* 331 U.S. 503 [67 S.Ct. 1431, 91 L.Ed. 1633, 170 A.L.R. 953].)

In such an inquiry as this, ''We start from the premise that the outbreak of war does not necessarily suspend or abrogate treaty provisions. *Society for Propagation of Gospel* v. *New Haven,* 8 Wheat.(U.S.) 464, 494-495 [5 L.Ed. 662]. There may of course be such an incompatibility between a particular treaty provision and the maintenance of a state of war as to make clear that it should not be enforced. *Karnuth* v. *United States,* 279 U.S. 231 [49 S.Ct. 274, 73 L.Ed. 677]. Or the Chief Executive or the Congress may have formulated a national policy quite inconsistent with enforcement of a treaty in whole or in part. This was the view stated in *Techt* v. *Hughes, supra* (1920), 229 N.Y. 222 [128 N.E. 185, 11 A.L.R. 166]), and we believe it to be the correct one. That case concerned the right of a resident alien enemy to inherit real property in New York. Under New York law, as it then stood, an alien enemy had no such right. The question was whether the right was granted by a reciprocal inheritance provision in a treaty with Austria which was couched in terms practically identical with those we have here. The court found nothing incompatible with national policy in permitting the resident alien enemy to have the right of inheritance granted by the treaty. Cardozo, J., speaking for the court, stated the applicable principles as follows:

'' 'The question is not what states *may* do after the war has supervened, and this without breach of their duty as members of the society of nations. The question is what courts

are to presume that they have done. . . . President and Senate may denounce the treaty, and thus terminate its life. Congress may enact an inconsistent rule, which will control the action of the courts (*Fong Yue Ting* v. *United States,* 149 U.S. 698 [13 S.Ct. 1016, 37 L.Ed. 905]). The treaty of peace itself may set up new relations, and terminate earlier compacts, either tacitly or expressly. . . . But until some one of these things is done, until some one of these events occurs, while war is still flagrant, and the will of the political departments of the government unrevealed, the courts, as I view their function, play a humbler and more cautious part. It is not for them to denounce treaties generally, *en bloc.* Their part it is, as one provision or another is involved in some actual controversy before them, to determine whether, alone, or by force of connection with an inseparable scheme, the provision is inconsistent with the policy or safety of the nation in the emergency of war, and hence presumably intended to be limited to times of peace. The mere fact that other portions of the treaty are suspended or even abrogated is not conclusive. The treaty does not fall in its entirety unless it has the character of an indivisible act.' 229 N.Y., pp. 242-243 [128 N.E. 192, 11 A.L.R. 166].'' (*Clark* v. *Allen, supra,* 331 U.S. 503, 508-510.)

▮ It does not appear that exempting the "lands and buildings'' of either nation from taxation by the other is so incompatible with the maintenance of a state of war as to require an inference that the contracting parties intended the abrogation or suspension of such exemption during time of war.

How could the use* made of this property during 1941-1947 and the tax exemption of property so used interfere with or impair our war effort? Continued recognition of such exemption would seem no more incompatible with the maintenance of war than was our continued recognition of Germany as the owner of this property. Nor does continued recognition of such ownership and the attendant tax exemption seem any more incompatible with a state of belligerency than the right of inheritance accorded nationals of the respective contracting parties by article IV of the same treaty. It is important to bear in mind the reciprocal aspect of this tax exemption. It is of equal benefit to the respective contracting parties. The United States benefits from the tax exemption of its "lands

---

*For the purpose of this phase of the discussion we assume that such use was a governmental use by the owner, the German government.

and buildings" in Germany just as does Germany benefit from the tax exemption of its "lands and buildings" in this country. That interest conceivably is as important in time of war as in time of peace, to the United States as well as to the German government.

Persuasive of this view is the attitude of our State Department, expressed in three communications to our Department of Justice. "The Department of State is of the view that the legal effect of these provisions [that portion of article XIX of the treaty hereinabove quoted] was unchanged by the outbreak of war between the United States and Germany. This view is in complete accord with the policy long followed by this Government, both in time of peace and in time of war, with regard to property belonging to the government of one country and situated within the territory of another country. This Government has consistently endeavored to extend to the property of other governments situated in territory under the jurisdiction of the United States of America the recognition normally accorded such property under international practice and to observe faithfully any rights guaranteed such property by treaty. This Government, likewise, has been equally diligent in demanding that other governments accord such recognition and rights to its property in their territories.

"The history of this Government's treatment of the German diplomatic and consular properties in the United States following the outbreak of war between the United States and Germany may be of interest in connection with this matter.

"By a note dated December 12, 1941, the Swiss Minister in Washington informed the Secretary of State as follows:

" 'I have the honor to inform you that the German Government has asked the Swiss Federal Council to take charge of the German interests in the United States for the duration of the war. Subject to the American consent, the Swiss Government has declared its willingness to assume this responsibility.

" 'In consequence, I should be very much obliged to you if you would be so good as to let me know whether the American Government is ready to give the above mentioned consent, sought by my Government.'

"The Under Secretary of State replied on behalf of the Secretary of State by a note dated December 16, 1941, to the Minister of Switzerland as follows:

" 'In acknowledging the receipt of your note of December

12, 1941 announcing the request of the German Government that the Swiss Federal Council assume the representation of German interests in the United States for the duration of the war, I have the honor to inform you that the Government of the United States agrees to the assumption of German interests in the United States by the Swiss Government.' "

"Pursuant to these notes, the property of the German Government in the United States, including the above-mentioned property in San Francisco, was recognized by this Government as being in the custody of the Swiss Government until May 23, 1945, when, by a protocol signed at Washington on that date by the Minister of Switzerland and an Assistant Secretary of State, the Minister of Switzerland released such property to a representative of the Government of the United States of America. That protocol reads in part as follows:

" 'All respective premises, archives, and property are only transferred to the American Government

" 'FIRST: In view of the fact that Germany has surrendered unconditionally; and

" 'SECOND: Inasmuch as the American Government is the trustee of the governments which will exercise authority in Germany.'

"The signature to that protocol by Assistant Secretary of State, 'J. C. Holmes', is preceded by a statement reading:

" 'I accept as of this date for the account of the American Government and under the stipulations set forth above, the premises, archives, and property described in this Protocol.' "

"In view of these considerations, the Department of State perceives no objection to the position which the Office of Alien Property is advancing that the provisions of the second paragraph of Article XIX of the treaty signed December 8, 1923 with Germany remain in effect despite the outbreak of war between the United States and Germany." (Signed for the Acting Secretary of State by Jack B. Tate, Acting Legal Adviser, addressed to the Honorable Tom C. Clark, Attorney General, and dated November 10, 1948.)*

---

*We take judicial notice of this communication from the Secretary of State to the Attorney General as an official act of an executive department of the United States government (Code Civ. Proc., § 1875, subd. 3; *Southern Pac. Land Co.* v. *Meserve,* 186 Cal. 157, 159 [198 P. 1055], a letter of instructions from the commissioner of the land office to the United States surveyor-general in California; *Southern Pac. Co.* v. *Lipman,* 148 Cal. 480, 491 [83 P. 445], a letter of the commissioner of the general land office to the registrar and receiver of the land office at Los Angeles. See also *Bourdieu* v. *Seaboard Oil Corp.,* 38 Cal.App.2d 11 at 23 [100 P.2d 528], and *Livermore* v. *Beal,* 18 Cal.App.2d

Of similar import are communications of December 27, 1950, from Warde M. Cameron, Assistant Legal Adviser of the Department of State, to Harold I. Baynton, Assistant Attorney General, and of May 24, 1951, from Jack B. Tate, Deputy Legal Adviser of the Department of State, to Harold I. Baynton, Assistant Attorney General, Department of Justice, each introduced in evidence herein.

Defendant's argument which leads to the conclusion that the tax exemption clause under consideration was suspended when war was declared, depends principally upon an erroneous assumption that the exemption was given solely to facilitate the performance of consular functions and ceases to operate during any period of cessation or suspension of consular activities. That is too narrow an interpretation. The clause under consideration does appear in a series of articles which deal with "consular officers" and their functions and privileges but as a physically separable provision which is significantly broad and general in its terms, not limited or restricted to "consular" officers, offices, or activities. Instead, it uses the expressions "lands and buildings" in the territory of either High Contracting Party of which "the other High Contracting Party" is the legal or equitable "owner." Such lands and buildings, if "used" exclusively for "governmental" purposes by that "owner," are exempt from taxation. These general terms token an intent not to limit the exemption to periods of use for any particular purpose (such as the active conduct of consular affairs) but for any use which is "governmental." Also, defendant overlooks the reciprocal feature, the benefit to our government of freedom from taxation of its property situate in German territory.

This reciprocal tax exemption clause bears no such relation to the active conduct of consular affairs by either of the contracting parties as would warrant an inference or give rise to a presumption that the parties intended its suspension during the suspension of the active conduct of consular affairs by either of them.

(2) *Was this tax exemption provision suspended or abrogated by congressional enactment or by presidential or executive action incompatible with its enforcement?*

---

535, at 540-542 [64 P.2d 987], and cases there cited). Courts take judicial notice of treaties and their interpretation by the judicial and the executive branches of government. (*San Lorenzo Title & Imp. Co. v. Caples* (Tex.Civ.App., 1932), 48 S.W.2d 329, 331, affirmed 124 Tex. 33 [73 S.W.2d 516].)

Defendant contends that the provisions of the Trading with the Enemy Act (50 U.S.C.A. App. §§ 1-40) as amended by the First War Powers Act (50 U.S.C.A. App. §§ 619-620) and certain actions taken by the President, the Secretary of State and the Attorney General of the United States evince a national policy inconsistent with the recognition or enforcement of the tax exemption provision of the treaty. Defendant especially invokes certain of the provisions of sections 2, 3, 5, 6, 32 and 39 of the Trading with the Enemy Act.

Section 3 of the act severely restricts trading with the enemy as defined in section 2. The policy indicated by such restrictions has no apparent bearing upon or inconsistency with the policy that each of the two governments refrain from taxing the "lands and buildings" of the other.

Section 5 provides that "any property or interest of any foreign country or national thereof shall vest, when, as, and upon the terms, directed by the President, in such agency or person as may be designated from time to time by the President, and upon such terms and conditions as the President may prescribe such interest or property shall be held, used, administered, liquidated, sold, or otherwise dealt with in the interest of and for the benefit of the United States." Section 5 is implemented by the provisions of section 6. This vesting provision is a frank recognition of alien ownership and the continuation thereof in time of war, as to each item of property so owned, until the vesting power is exercised. We fail to see how the creation of such a power evinces a congressional policy which is incompatible with the tax exemption of that very property in time of war.

Defendant says that sections 32 and 39 declare a policy never to return to an enemy alien property taken from him by the exercise of the vesting power. Such a policy, defendant argues, renders purposeless the tax exemption clause. It says there would be no conceivable benefit accruing to the German government by continuing the tax exemption of property seized. Even from such a premise that conclusion does not necessarily follow. Such property and its proceeds in the hands of our government appear to be subject to the claims of creditors of the former owner (see 50 U.S.C.A. App. §§ 32-36), an element of some benefit to the former owner. More significant in the present inquiry is the fact that section 32 was not added to the statute until March 8, 1946 (60 Stats. 50); sections 33-36, not until August 8, 1946 (60 Stats. 925-930); and section 39, not until July 3, 1948 (62 Stats. 1246).

Moreover, sections 32-36 do not prohibit the return of property to the former owners. They simply fail to provide for such return. It was not until the addition of section 39 on July 3, 1948, that Congress adopted the policy of no return. By that enactment it declared that "No property or interest therein of Germany, Japan, or any national of either such country vested in or transferred to any officer or agency of the Government at any time after December 17, 1941, pursuant to the provisions of this Act [sections 1-6 and 7-39 of this Appendix], shall be returned to former owners thereof or their successors in interest, and the United States shall not pay compensation for any such property or interest therein." (50 U.S.C.A. App. § 39; enacted by 62 Stats. 1246.) That occurred well after the events involved in this action. Of further significance is the fact that section 12 of the Trading with the Enemy Act has continuously provided that "after the end of the war any claim of any enemy or of an ally of enemy to any money or other property received and held by the alien property custodian or deposited in the United States Treasury, shall be settled as Congress shall direct," unless meanwhile conveyed pursuant to order of the President or of a court in accordance with the provisions of sections 9 and 10 of the act." (Act of October 6, 1917, 40 Stats. 411 at 424.) It happens that after World War I Congress provided for the return to Germany and certain other former belligerents of money or other property held by our alien property custodian if it had been the "diplomatic or consular property of such government." (Act of June 5, 1920, amending section 9 of the Trading with the Enemy Act; 41 Stats. 977 at 979.) Accordingly, even after the vesting in September, 1947, and until the addition of section 39 to the statute in July, 1948, there was the possibility that the property here involved might ultimately be returned to the German government.

The actions of the President, the Secretary of State and the Attorney General by which, according to the defendant, the executive branch of our government evinced a policy incompatible with the recognition of this tax exemption during the war consisted, for the most part, of orders made pursuant to the provisions of the Trading with the Enemy Act, culminating in the Attorney General's vesting order of September 4, 1947. Those actions of the executive branch appear to us no more indicative of an incompatible national policy than the provisions of the statute which authorized such action.

There is some evidence that when our State Department took over from the Swiss government, in accordance with the protocol hereinbefore mentioned, consular records, papers and documents were removed from filing cabinets and put into boxes. Defendant infers therefrom that the State Department did as it pleased with those records, thereby violated the consular immunity, and thus evinced a national policy inconsistent with a continuance of the tax exemption here involved. We see no basis for such an inference. For aught that appears in this record, the removal of papers and documents from filing cabinets to boxes may have been for the better protection and preservation of those papers and documents. Even if there were a basis for defendant's inference, such action by the State Department would not necessarily indicate that it entertained a policy inconsistent and incompatible with the continuance of the tax exemption, especially in view of its explicit expression of opinion to the contrary on three separate occasions. (Communications to the Attorney General in 1948, 1950, and 1951, above cited.)

Defendant also attaches significance to the cessation or termination of consular activities by executive action taken prior to the outbreak of the war. Such action was no more incompatible with the continued existence of this tax exemption than are the provisions of sections 2 and 3 of the Trading with the Enemy Act, already discussed.

We conclude, in the words of the Supreme Court in *Clark* v. *Allen, supra,* that the Trading with the Enemy "Act and the Executive Orders do not evince such hostility to ownership of property by [or exemption from taxation of lands and buildings of] alien enemies as to imply that its acquisition [or the continued recognition of the tax exemption] conflicts with national policy." (P. 510 of 331 U.S.)

██ (3) *Does the evidence support the finding that from April 29, 1941, until the vesting order in September, 1947, the property in question was used by the German government for governmental purposes?*[*]

Concerning the custodial and protective care given this

---

[*]The finding was that the property was "used by the German government exclusively for governmental purposes, to-wit, as Office of the German Consulate General in the City and County of San Francisco, State of California, and for no other purpose or purposes whatsoever." This description of the use "as Office of the German Consulate General" was unnecessarily specific. The treaty accords the exemption in respect to property used "exclusively for governmental purposes" not confining it to a use for a consular office only.

property during the period in question, defendant contends that it was not throughout a use by the ''owner,'' the German government, nor a use for ''governmental purposes,'' nor actually a ''use'' of any kind within the meaning of the statute. The principal fallacy in defendant's line of reasoning inheres in its assumption that the words ''used exclusively for governmental purposes by that owner'' mean use by the government of Germany as the office of the German Consulate at San Francisco in the active conduct of consular affairs. This is the same fundamental fallacy which led the defendant to conclude, erroneously, that this tax exemption provision was automatically suspended or abrogated upon the declaration of war in 1941.

We are persuaded that the custodial and protective care given this property throughout the period in question was a ''use'' of that property, and that such use was for a ''governmental purpose.'' The exercise of such a custodial and protective function of government owned property would seem clearly to be a governmental function.

While not precisely the same as the instant case in all respects, the decision in *City of Springfield* v. *United States* (1938), 99 F.2d 860 (petition for writ of certiorari denied by the Supreme Court, 306 U.S. 650 [59 S.Ct. 592, 83 L.Ed. 1049]), is persuasive. In that case the Circuit Court of Appeals for the First Circuit held that property which was acquired and until 1933 used as a site for a post office and since that time, pending its disposal, had been leased and used by the lessee as a bus terminal, was exempt from taxation under a state statute that exempted property owned by the United States and ''constitutionally held and used by it for essential governmental functions'' (p. 862). ''There can be no question,'' said the court ''that the property had been constitutionally acquired and held and used for essential governmental functions up to 1933, or so long as it was used as a post office site. Upon its abandonment as a post office site, Congress [citations], it is equally clear, had power in the exercise of its governmental functions to dispose of any such property held by it. [Citations.] The right to dispose of property by the United States which is no longer needed, is an essential governmental function in the economic management of governmental affairs, and is recognized [citations]; and while the government is seeking a purchaser, the leasing of such property conditioned on a thirty days' notice to terminate such lease in case a purchaser is found cannot have

the effect of subjecting such property to taxation by the municipality in which it is situated [citations]." (P. 863.) Of similar import is *Security State Bank* v. *Dent County* (1940), 345 Mo. 1050 [137 S.W.2d 960]. It held that a lot purchased by a county for a jail site but actually used to store cordwood used in county buildings and to store county road machinery, was used for governmental purposes.

The custodial care given this property during the period in question was probably the maximum "use" that could be made of it by the owner during that period. The preservation of the property, whether in the hope of again using it as a consular office or for a residence for the consul or for ultimate sale, would seem clearly to be a "use" of it and a use for "governmental purposes."

This was also a use by the "owner," the German government; directly so until shortly after war was declared, then through the medium of the Swiss government and later through the medium of our Department of State.

Persuasive of these conclusions are the views expressed by our State Department in its communication of May 24, 1951, to the Attorney General of the United States, above cited: "The exemption from taxation provided in Article XIX of the German treaty is applicable reciprocally to lands and buildings of which either the United States or Germany is the legal or equitable owner situated in the territory of the other, and which are exclusively used for 'governmental purposes' by that owner. The provision is not limited in its application to property used for consular purposes. An interpretation which limited the application of the provision to property used exclusively for consular purposes, or to property used only as a consular office, and not as a residence for the Consul General as well, would not be in accord with this Government's interpretation of the provision or with the evident intent of the negotiators of the Germany treaty.

"As you are no doubt aware, this Government has had occasion to acquire sizable amounts of property abroad to be used as embassies, legations, consulates, and other governmental establishments. In many foreign countries the United States has found it necessary or desirable to purchase or otherwise acquire property for use as residences of employees of this Government stationed abroad. It would appear that a restrictive interpretation by a court in the United States of the meaning of the phrase 'used exclusively for governmental purposes' would have an adverse effect upon

the status of property owned by the United States abroad. The Department might thereafter be precluded from contending that many pieces of such property were used by the United States for governmental purposes, and should, therefore, be exempt from taxation.

"The Department is also of the view that the use of the premises after the consulate was closed for the storage of official documents and other property owned by the German government should be considered as a use of the premises for governmental purposes within the meaning of Article XIX."

(4) *Was the tax exemption, if it existed theretofore, terminated when title was vested in the United States in September, 1947?*

Defendant contends that the following language of section 36 of the Trading with the Enemy Act terminated the tax exemption of this property immediately upon acquisition of title by the United States by the vesting order of September, 1947: "The vesting in or transfer to the Alien Property Custodian of any property or interest . . . shall not render inapplicable any Federal, State, Territorial or local tax for any period prior or subsequent to the date of said vesting or transfer . . ." and "the Alien Property Custodian shall . . . pay any tax incident to any such property or interest . . . at the earliest time appearing to him to be not contrary to the interest of the United States . . . Every such tax shall be paid by the Alien Property Custodian to the same extent, as nearly as may be deemed practicable, as though the property or interest had not been vested in or transferred to the Alien Property Custodian . . ." This language, in its context, means simply that property which up to the time of vesting had been subject to taxation would not become exempt therefrom upon becoming property of the United States pursuant to a vesting order of the Attorney General. The clause first quoted simply says that the "vesting" does not of itself "render inapplicable" any tax otherwise applicable. It does not by its terms render applicable any tax which is otherwise inapplicable. The second clause merely directs the Alien Property Custodian to pay any tax "incident to" any property which becomes vested in him, meaning of course any tax otherwise incident. There was no city and county tax "incident to" the land and building here involved because of the exemption accorded by article XIX of the treaty. Section 36 was added to the Trading with the Enemy Act in 1946 (50 U.S.C.A. App. § 36; 60 Stats. 925 at

929). It had long since been established that property belonging to the United States was exempt from taxation (*Irwin* v. *Wright*, 258 U.S. 219, 228 [42 S.Ct. 293, 66 L.Ed 573]). It had recently been established that the title which the United States acquires by a vesting order is absolute. (*Cummings* v. *Deutsche Bank* (Feb. 1937), 300 U.S. 115, 120-121 [57 S.Ct. 359, 81 L.Ed. 545].) Congress doubtless deemed legislation necessary to prevent federal acquisition of title from terminating the tax liability of property which was otherwise subject to taxation.

The judgment appealed from is affirmed.

Peters, P. J., and Bray, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied August 19, 1954.