Nick CHAVERS, Plaintiff,

v.

ST. PAUL FIRE AND MARINE INSUR-
ANCE COMPANY, Defendant.

Civ. No. 35107.

United States District Court
N. D. Ohio, E. D.

Oct. 21, 1960.

Michael Gallagher, Robert Walter
Jones, Hauxhurst, Inglis, Sharp & Cull,
Cleveland, Ohio, for plaintiff.

Mark O'Neill, Frank Seth Hurd, Cleve-
land, Ohio, for defendant.

CONNELL, District Judge.

Plaintiff instituted this action under
the Declaratory Judgment Act, 28 U.S.C.
§ 2201, petitioning this Court to adjudge
that (1) the plaintiff is an insured under
the policy of automobile insurance issued
to one Norman V. Grund by the defend-
ant, and is entitled to all the protection
afforded by that policy; (2) defendant
is obliged to defend plaintiff against any
claim arising out of the accident de-
scribed below, and to pay all sums which
plaintiff may become legally obligated to
pay as a result of this same accident;
(3) defendant wrongfully breached its
contract of insurance by failing to defend
against the above-mentioned claims; and
(4) the defendant should pay such rea-
sonable attorney's fees and expenses as
may be incurred by the plaintiff as a re-
sult of defendant's breach of contract.

Through the expedient of well-planned
discovery devices, namely depositions and
requests for admissions, both parties
have concluded, and this Court agrees,
that there is no dispute as to the material
facts involved in this litigation, conse-
quently both parties have moved the
court for summary judgment.

Although the salient facts are not in
issue, a brief résumé of them is appro-
priate so that the legal issues confronting
us can be better understood. The plain-
tiff, Nick Chavers, was employed by the
Stouffer Corporation to assist patrons of
its Shaker Square restaurant in the park-
ing of their cars in a lot located directly
at the rear of the restauarant, and to
render other services to them consistent
with the establishment and maintenance

of good public relations between the patrons and the restaurant. Although he received his monthly compensation from his brother, John Chavers, and was apparently of the belief that he was answerable in his employment activities only to John, it is manifest from the supplementary briefs of both parties, and from the deposition of Gordon Forbes, the manager of the Shaker Square restaurant, that Stouffer's was plaintiff's actual and only employer. From plaintiff's deposition we determine that his duties as lot attendant varied, depending on the number of cars using the lot on any particular night. On slow nights he might merely direct the patrons of the restaurant to a particular parking spot, but when the lot was crowded he would often suggest that the patron leave the car in the driveway and he would park it, thus saving both the patron's time and the lot's space. He would reverse the operation on the patron's departure. In addition to his parking duties, plaintiff and other similarly-employed attendants were instructed by Mr. Forbes to wipe the windshields of patrons' cars on rainy days, to remove snow and ice from windshields, to address the patrons politely, to help patrons with packages when necessary, to furnish umbrellas for the patrons in assisting them to their cars in inclement weather, and to altogether act in a courteous manner to encourage patronage of the restaurant rather than to discourage it.

Until early 1957, plaintiff, along with the other lot attendants, used punchcards to record their working hours, and were paid directly by a paycheck from Stouffer's. At that time however, a question arose as to whether the attendants were spending all of their working hours on the job, and Forbes, to obviate this problem, instituted a new system of paying the attendants. It was decided to vest supervision of the attendants in one person (John Chavers), and payment to the other attendants would be made by him out of a single monthly check of $250 given him by Stouffer's. The amount of the check was arrived at by averaging the amount of pay received by each of the attendants over a period of months immediately preceding the change. But the method of payment did not affect the employment relationship of the attendants with Stouffer's, and the manager of the Shaker Square restaurant retained the authority to hire and fire the attendants, and to supervise their employment activities.

The accident upon which the present action is predicated occurred on the evening of November 16, 1957. Norman V. Grund, a regular patron of the restaurant, drove his car into the lot and left it for plaintiff to park. It is admitted by both parties that the plaintiff, in parking the car, was doing so with the express permission of Grund, and thus, absent additional circumstances, was an insured within the provisions of Grund's liability insurance policy. As Grund was walking towards the back entrance of the restaurant, plaintiff unaccountably lost control of Grund's car and ran into him, causing him physical injury. Grund subsequently instituted two law suits in Cuyahoga County Common Pleas Court to recover damages for the injuries suffered. One law suit named plaintiff as the defendant, and the other named the Stouffer Corporation as defendant, and was based upon the doctrine of respondeat superior, imputing the alleged negligence of Nick Chavers to Stouffer's, his alleged employer. Stouffer's then notified plaintiff that it looks to him for a complete indemnification of any loss or expense it might incur by reason of the lawsuit instituted against it.

As a result of the above sequence of legal proceedings, plaintiff instituted this action for declaratory judgment. The object of the action is to secure a judicial declaration that the defendant extends coverage to the plaintiff under a policy of automobile liability insurance issued by the defendant to Norman V. Grund, as named insured, affording liability insurance both to him and to other persons using and operating, with

Grund's permission, a 1953 Jaguar sedan identified in the policy.

The policy of Grund's that was in effect on November 16, 1957, contained an exclusion clause which provided that the policy does not apply "(e) to an owned automobile while used in the automobile business, * * *" Automobile business was defined in the policy as meaning "the business of selling, repairing, servicing, storing or parking of automobiles".

The question, then, which confronts us on this motion for summary judgment is this: At the time of the accident in which Norman V. Grund was injured, and upon which this motion emanates, was Grund's automobile being used in the business of storing or parking of automobiles so as to exclude Nick Chavers from the coverage he would otherwise be entitled to under the omnibus provision of the policy? The briefs of both parties, submitted in support of their cross motions for summary judgment, although recognizing the issue in the case is as stated above, reach their opposite conclusions from diverse approaches. The plaintiff claims that Stouffer Corporation is not in the automobile business as that term is intended in the policy, and that consequently the plaintiff, an employee of Stouffer's and clearly acting within the scope of his employment, could not have been using the car in the automobile business at the time of the accident. Defendant supports its motion by contending it is immaterial whether Stouffer's is in the automobile business within the meaning of that term as used in the exclusion clause, for it is not the party claiming coverage. The real question, it argues, is whether Nick Chavers, at the time he injured Grund, was in the "automobile business", and concludes that he was since he was receiving compensation for per-forming services which include, among other things, the parking of cars for the patrons of the restaurant.

 There is a general and necessary rule of law which has found unanimous acceptance in Ohio. This rule, demonstrated in a long line of Ohio cases,[1] is condensed in Ohio Jurisprudence to read as follows:

It is one of the best-known principles of insurance law that a policy or contract of insurance is to be construed liberally in favor of the insured or his beneficiary, and strictly as against the insurer. Stated more fully, the Ohio courts undoubtedly accord with the generally accepted rule that if an insurance contract is so drawn as to be equivocal, uncertain, or ambiguous, and to require interpretation because fairly susceptible of two or more different but sensible and reasonable constructions, the one will be adopted which, if consistent with the objects of the insurance, is most favorable to the insured or his beneficiary. 30 Ohio Jur.2d at 255.

The reason for the rule is apparently that an insurance contract, like any other written agreement, should be interpreted against the party who has drawn it and who is responsible for the language employed therein,[2] as well as the fact that to defeat a claim on the basis of ambiguous language in the contract would be unjust to an insured who has paid a substantial premium to receive the protection he thought he was getting.[3]

Defendant's entire analysis of the legal issues involved in this case is based on the assumption that the status of Nick Chavers, not Stouffer's, in relation to the term "automobile business" controls the determination of the case. We are persuaded otherwise. As we read

---

1. Home Indemnity Co. v. Village of Plymouth, 1945, 146 Ohio St. 96, 64 N.E.2d 248; Boatman's Fire & Marine Ins. Co. v. Parker, 1872, 23 Ohio St. 85; and see citations in 30 Ohio Jur.2d 225, n. 11.

2. American Policyholders Ins. Co. v. Michota, 1952, 156 Ohio St. 578, 103 N.E. 2d 817, 35 A.L.R.2d 448.

3. Kitt v. Home Indemnity Co., 1950, 153 Ohio St. 505, 92 N.E.2d 685.

the exclusion invoked by defendant, it applies only if the automobile was being used in the business of storing or parking of automobiles at the time of the accident. Thus, the business the *car* was being used in, not the business or occupation of the person using the car, be he a claimant under the policy or not, is the important consideration. To us this distinction is both reasonable and necessary, for otherwise defendant's reasoning could be stretched to ridiculous proportions. For instance, the car might have been lent to a salesman friend of the named insured, and this friend was using the car to make sales calls. In anticipation of seeing a customer, and while backing into a parking space, he hits and injures another person. The driver was certainly parking the car in anticipation of making a monetary gain, for the car had to be parked before the call could be made. Thus he, like plaintiff in the instant case, was performing one of the various steps necessary to make a monetary gain when the accident occurred. Although the driver in this hypothetical was clearly "parking" the car at the time of the accident, I wonder whether defendant could reasonably argue non-coverage under paragraph (e) of the policy's exclusion section? Or *going to the other extreme, would defendant admit the inapplicability of paragraph (e) of the exclusion section in a situation where an employee of a commercial parking lot hits and injures a person while bringing the insured car to the owner as he was preparing to leave the lot?* Here the person driving the car at the time of the accident was doing the opposite of "parking" the car; "unparking" it if you will. Presumably, too, he was being paid by his employer as much to take the automobile to customers of the lot upon their leaving as to park the cars for them as they come into the lot, much the same as plaintiff, in the instant case, was paid by Stouffer's to perform a multiplicity of jobs, only one of which actually included the parking of cars. To us, these examples make it fairly obvious that it is the type of business enterprise or organization in which the automobile is used that is envisioned by the automobile business exclusion clause in the policy, and that the occupation [4] of the person actually driving the car is of no moment in the construction of the policy in this respect.

But even if we were to agree with defendant and approach the problem by analyzing the status of plaintiff at the time of the accident, we still could not reach the result that defendant suggests. In order to escape the application of the unwavering rule of law concerning ambiguity in insurance policies which we reviewed above, defendant must show that "automobile business" clearly and manifestly included the type of activity in which plaintiff was engaged at the time of the accident. We do not think it succeeded. In support of its proposition, defendant cites as its only apparent authority [5] a definition of "business" from Webster's New International Dictionary, Second Edition.

3. That which busies, or engages time, attention, or labor, as a principal serious concern or interest. Specif. *a* constant employment; regular occupation; work; * * *

Granting that this definition includes plaintiff's activities at the restaurant, there is a patent weakness of this cita-

---

4. Defendant seems to have impliedly recognized the validity of analyzing the policy in relation to the status of the business actually employing the person parking the car, for it subsequently amended its definition of "automobile business" to include the "business or occupation" of parking cars.

5. Several other cases cited by defendant, apparently as general authority for its proposition, give effect to exclusion clauses of somewhat similar nature to the one in the instant case. See 1956, 47 A.L.R.2d 556. But none of these cases were concerned with the interpretation of the word "automobile business", and thus in no sense can be used as authority for the contention that plaintiff's occupation is determinative of whether the insured automobile was being used in the automobile business at the time of the accident.

tion as authority, in that there are six other denotations of the word "business" contained in the same general definition of the word, at least two of which (nos. 6 and 7) limit the application of the word "business" in the manner treated by the Court. Additionally, plaintiff cites several cases which clearly refuse to treat the word "business" as meaning merely an occupation or labor. See Karnuth v. United States, 1928, 279 U.S. 231, 49 S.Ct. 274, 73 L.Ed. 677, and Bloom v. Richards, 1853, 2 Ohio St. 387. Thus, the weight, if any, to be afforded defendant's argument that plaintiff was in the automobile business becomes minimal when viewed against this plain rule concerning ambiguities in insurance contracts. Defendant's argument seems to be based on the intention of the parties when the contract was made. But it is this type of argument that prompted the rule of law, and since defendant, as framer of the contract, is presumed to have known this rule, the intention of the parties must be shown with some certainty from the express provisions of the contract before we would feel justified in holding the rule inapplicable to the facts of this case.

Having disposed of that issue, we now turn to the further question involved: Was Stouffer Corporation in the automobile business at the time of the accident? Plaintiff's brief goes to great lengths to show that it wasn't, and to our mind both the facts and the law cited in the brief concludes us on this question.

The lease under which Stouffer's, as lessee, *occupied and operated* its Shaker Square restaurant on November 16, 1957, included a provision whereby the parking lot in which Grund was injured could be used by Stouffer's in common with other Shaker Square tenants of the lessor until 6:00 p. m., and after 6:00 p. m. until closing time Stouffer's could use the lot exclusively. Although, in a sense, the use of the parking lot was a "quid pro quo" for the lessee's rental payments, it is clear from the lease's language, and from the diagram outlining the area leased by Stouffer's, that the parking lot was there for the benefit and use of the customers of the various lessees, not for the lessees themselves, although the lessees certainly derived a substantial, if indirect, benefit from such a parking arrangement. It is additionally clear from the pleadings and supporting briefs that Stouffer's did not, and probably could not, charge their patrons a fee for parking in the lot, and even though it hired attendants to assist its patrons in the use of the lot, it was done only with a view towards increasing the number of persons patronizing Stouffer's, persons who, if it were not for this additional service, might choose to dine elsewhere. But there is little doubt that Stouffer's could have remained in operation even if it didn't staff the lot with attendants, for its patrons can be presumed to be more concerned with the type of service inside the restaurant than they are with the slight service afforded them in parking their cars, and they could have parked in the same place whether the lot was attended or not.

We think several cases cited by plaintiff directly support our decision in this respect, and it was perhaps the persuasiveness of these cases that prompted defendant to urge the proposition disposed of above, i. e. that the status of plaintiff, not Stouffer's is the important consideration. A highly relevant case is the City of Cleveland v. Ruple, 1936, 130 Ohio St. 465, 200 N.E. 507, 103 A. L.R. 853, where the Supreme Court of Ohio decided that the city could not use its underground parking facilities to compete, on a purely private basis, with other parking businesses in the area, for this would be an undue interference with the constitutional right of private property. On the other hand, the city was allowed to use the facilities, and even charge a reasonable fee, in conjunction with the use of the public stadium and public hall adjoining the underground lot, for this use would then be *incidental* to the public purpose present when the public hall or stadium was in use. Though the distinction is between

the use of the garage as a purely private business compared to a quasi-public business, its rationale seems to us clearly to extend to the instant situation, for under no circumstances can it be said that Stouffer's Shaker Square restaurant was or is engaged in the purely private business of parking cars in competition with other lots or garages in the vicinity. In fact, that the use of the lot by Stouffer's was incidental to its primary business seems far more clear than the incidental use of the underground parking facilities by the city, for Stouffer's did not own or control the lot, nor did or could it charge for the use of the lot, and it was likely the lack of other private parking facilities in the area of the restaurant that made the lot so important to the Shaker Square restaurant. The fact that Stouffer's has chosen to accommodate its patrons by attending the lot is no less a mere incident of its restaurant business than is the stationing of attendants in the rest rooms, or a doorman at the front door, or a hostess in the dining room.

Other cases are highly persuasive. For instance, in City of Toledo v. Jenkins, 1944, 143 Ohio St. 141, 54 N.E.2d 656, the Ohio Supreme Court held that the maintenance of facilities in a part of the Toledo Municipal Airport for private airplanes that utilize the airport did not subject such facilities to taxation as a private enterprise, since the facilities were adjacent and incidental to the main operation of the tax-free public airport. And see Blakemore v. Cincinnati Metropolitan Housing Authority, 1943, 74 Ohio App. 5, 57 N.E.2d 397, where the court recognized the necessary distinction between parking facilities clearly appurtenant to another business, and the private business of parking cars for a profit. See also State ex rel. Szodomka v. Gruber, 1942, 201 La. 1068, 10 So.2d 899, where the Louisiana Supreme Court decided that the maintenance of a parking area adjacent to a restaurant did not constitute a conduct of a business within the meaning of a zoning ordinance.

We think that the above-discussed cases convincingly show that the term "automobile business" as used in the insurance policy under scrutiny did not comprehend the incidental use of available parking space by Stouffer's in conjunction with the operation of its restaurant. But even if there existed some doubt as to whether the operation of the parking lot ought to be treated as an "automobile business", we would again be confronted with the rule heretofore explained, i. e. that when an insurance policy contains language reasonably susceptible to different interpretations, it will be given the construction most favorable to the insured.

Plaintiff's motion for summary judgment is granted, and the judicial declaration sought by plaintiff is allowed, with the exception, of course, that defendant is not obliged to pay to plaintiff any sum beyond the limits of the policy. Additionally, defendant's cross-motion for summary judgment is denied. An order may be prepared in accordance with the foregoing.