71 N.J. Super. 538 (1962)
177 A.2d 315
FLORENCE LeFELT AND REUBEN LeFELT, PLAINTIFFS,
v.
WASILI NASAROW, DONATO T. BRACIGLIANO, ALSO KNOWN AS THOMAS D. BRACIGLIANO, AETNA INSURANCE COMPANY, A CORPORATION, AND THE PHOENIX INSURANCE COMPANY, A CORPORATION, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided January 17, 1962.
*539 Mr. Archie Elkins for the plaintiffs.
*540 Mr. Samuel Doan for the defendant Aetna Insurance Company (Messrs. Stalter, Doan & DeYoe, attorneys).
Mr. James H. McLeod for the defendant Phoenix Insurance Company.
KOLOVSKY, A.J.S.C.
Before the court for determination, after trial of an action for a declaratory judgment, is the question of whether, under the circumstances hereinafter detailed, liability insurance coverage was afforded to either or both individual defendants under automobile liability insurance policies issued by defendant insurance companies.
Basic to a resolution of that question is the construction to be given exclusionary clauses in each of the policies providing inter alia that: "This policy does not apply * * * to (an owned) (a non-owned) automobile while used in the automobile business." The other issues posed by the pretrial order, as amended and supplemented at the trial, present no difficulty.
Nor are the facts in substantial dispute.
Defendant Nasarow, owner of a 1949 Oldsmobile automobile, was the "named insured" in an automobile liability insurance policy covering that automobile issued by defendant Aetna Insurance Company (Aetna).
Defendant Bracigliano, owner of a 1953 Packard automobile, was the "named insured" in an automobile liability insurance policy issued by defendant Phoenix Insurance Company (Phoenix) covering that automobile.
Bracigliano was employed as a truck driver and mechanic by Curbit Trucking Co. of Paterson. On occasion and outside of his regular working hours, he would do repair work on automobiles other than those of the trucking company, although he "never openly advertised [he was] in the repair business." Most of his outside repair work was either to his own automobile or to those of his family or friends; on occasion he did repair work for others. For *541 about a year prior to April 28, 1959 he and two friends had rented a garage on Straight Street, Paterson, where each did his own repair work.
On April 27, 1959 Nasarow stopped at the garage of Curbit Trucking Co. on Prince Street, Paterson, and met Bracigliano for the first time. What caused Nasarow to stop at the garage  whether it was, as he says, to have his automobile repaired, or, as Bracigliano says, to negotiate for the purchase of Bracigliano's Packard automobile  is of no moment. It is undisputed that after driving the Oldsmobile around the block Bracigliano diagnosed the source of the noise of which Nasarow complained to be in its "rear end"; and it was agreed that Bracigliano should complete required repairs for $40. The car was driven to Bracigliano's garage on Straight Street where Nasarow was to pick it up two days later.
Bracigliano obtained a used "rear end" from a dealer in used car parts, installed it in the Nasarow Oldsmobile, and then, early in the evening of April 28, 1959, took the automobile out for a test run.
He had reached the intersection of West Broadway and Barbour Street, about two miles from the Straight Street garage, when a collision occurred between the front of the Oldsmobile and the rear of an automobile owned by plaintiff Reuben LeFelt and being driven by his wife, plaintiff Lillian LeFelt.
On June 6, 1959 plaintiffs filed a complaint in an action for damages against Nasarow and Bracigliano, charging that the collision and injuries allegedly sustained by plaintiff Florence LeFelt were caused by the negligent operation of the Oldsmobile, alleged to have been driven by Bracigliano as Nasarow's agent. Plaintiffs say their automobile was standing still when it was hit. Bracigliano says that the Oldsmobile was standing still and that plaintiffs' car backed into it.
Aetna undertook the defense of the negligence action on behalf of Nasarow, its named insured. Attorneys selected *542 by it filed an answer for him which, among other things, denied that Bracigliano was Nasarow's agent.
But both Aetna and Phoenix disclaimed coverage as to Bracigliano and refused to defend him. An answer was filed on his behalf by an attorney designated by the Unsatisfied Claim and Judgment Fund Board (see N.J.S.A. 39:6-61 et seq.) to whom plaintiffs had given notice of claim (N.J.S.A. 39:6-65).
With consent of counsel in the negligence action, that action was placed on the inactive list pending the determination of the present suit for a declaratory judgment.
Plaintiffs contend that liability insurance is afforded to Bracigliano by both the Aetna and the Phoenix policies and that such coverage is afforded to Nasarow by the Aetna policy.
At the trial, Aetna withdrew all defenses other than its claim that coverage is excluded by paragraph (g) of the "Exclusions" in its policy.
Phoenix abandoned its defense of lack of cooperation, asserted that coverage is excluded by paragraph (h) of the "Exclusions" in its policy and urged two other defenses. The first of these is based on the alleged failure of Bracigliano to forward the summons and complaint in the negligence action to Phoenix. But counsel for Phoenix, describing what the evidence in support of that defense would show, conceded that Bracigliano had tendered the suit papers to an agent of Phoenix and had been told to forward the papers to Aetna. There was thus a waiver of the policy provision requiring the summons and complaint to be sent to the company (Yannuzzi v. United States Casualty Co., 19 N.J. 201 (1955)) and Phoenix is estopped from asserting that defense (Weil v. Pennsylvania Fire Insurance Company, 58 N.J. Super. 145 (App. Div. 1959)).
Phoenix also urges that the declaratory judgment action cannot be maintained prior to entry of judgment in the negligence action because its policy provides:
*543 "No action shall lie against the company * * * until the amount of the insured's obligation to pay shall have been finally determined either by judgment against the insured after actual trial or by written agreement of the insured, the claimant and the company."
But under the settled law of this State the "no action" clause does not bar maintenance of an action for a declaratory judgment as to liability insurance coverage prior to judgment in the negligence action. Condenser Service, etc., Co. v. American, etc., Insurance Co., 45 N.J. Super. 31, 41 (App. Div. 1957); Hartford, etc., Indem. Co. v. Selected Risks Indem. Co., 65 N.J. Super. 328 (App. Div. 1961).
Judge (now Justice) Francis said in Condenser, supra, 45 N.J. Super., at p. 41:
"* * * [The `no action' clause] was never intended to serve, nor can it be construed to serve, the purpose of avoiding a declaration of rights when the insurer allegedly has repudiated the contract and declined to furnish an agreed defense of a covered damage action. To attribute such a significance to the restriction would be to render sterile the Declaratory Judgments Act in a substantial area of the insurance contract field. * * *."
In Hartford, etc., Indem. Co. v. Selected Risks Indem. Co., supra, 65 N.J. Super., at p. 332, Judge Freund said:
"As this court has previously remarked, `no more fertile ground exists for the use of the declaratory judgment procedure than in the field of insurance * * *.' Condenser Service & Engineering Co., Inc. v. American Mutual Liability Insurance Co., 45 N.J. Super. 31, 38 (App. Div. 1957); see Annotation, 142 A.L.R. 8-76 (1943). This is an area in which the construction of contractual language  a function for which the declaratory judgment machinery is tailormade  is a constantly recurring event. * * *"
Further, under the Unsatisfied Claim and Judgment Fund Act (N.J.S.A. 39:6-61 et seq.), if plaintiffs recover judgment in the negligence action, they would have to establish, in order to obtain an order directing payment of the judgment out of the Fund that:
*544 "The judgment debtor at the time of the accident was not insured under a policy of automobile liability insurance under the terms of which the insurer is liable to pay in whole or in part the amount of the judgment." N.J.S.A. 39:6-70(f).
Resolution of that question before rather than after trial of the negligence action would be of benefit to all concerned. It would put the onus of trying the case, or of settling it if that course is deemed desirable, on the party which would pay the judgment if one is recovered, whether that party be the Fund or either or both of the insurance companies.
Examination of the Aetna and Phoenix policies discloses that except for the designation of the "named insured" and the "owned automobile" in the respective policies, the pertinent provisions of the two policies are identical. By each, the respective insurance companies "agree * * * subject to all the terms of this policy * * *:
"* * * To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of:
A. bodily injury, sickness or disease, including death resulting therefrom, hereinafter called `bodily injury,' sustained by any person;
B. injury to or destruction of property, including loss of use thereof, hereinafter called `property damage'; arising out of the ownership, maintenance or use of the owned automobile or any non-owned automobile, and the company shall defend any suit alleging such bodily injury or property damage and seeking damages which are payable under the terms of this policy, even if any of the allegations of the suit are groundless, false or fraudulent; but the company may make such investigation and settlement of any claim or suit as it deems expedient."
"Owned" and "non-owned" automobile are defined as follows:
"`owned automobile' means a private passenger, farm or utility automobile or trailer owned by the named insured, and includes a temporary substitute automobile."
"`non-owned automobile' means an automobile or trailer not owned by or furnished for the regular use of either the named insured or any relative, other than a temporary substitute automobile."
*545 For the purpose of liability insurance coverage, persons insured are thus described:
"Persons Insured. The following are insured under Part I [liability insurance]:
(a) With respect to the owned automobile,
(1) the named insured and any resident of the same household,
(2) any other person using such automobile, provided the actual use thereof is with the permission of the named insured;
(b) With respect to a non-owned automobile,
(1) the named insured,
(2) any relative, but only with respect to a private passenger automobile or trailer, provided the actual use thereof is with the permission of the owner;
(c) Any other person or organization legally responsible for the use of
(1) an owned automobile, or
(2) a non-owned automobile, if such automobile is not owned or hired by such person or organization,
provided the actual use thereof is by a person who is an insured under (a) or (b) above with respect to such owned automobile or non-owned automobile."
Both Nasarow and Bracigliano are "insureds" under the Aetna policy; Nasarow as the "named insured" and owner of the "owned automobile," the Oldsmobile involved in the accident; and Bracigliano as a person whose use of the "owned automobile" was admittedly with the permission of Nasarow, the named insured. Indemnity Ins. Co. of North America v. Metropolitan Casualty Co., 33 N.J. 507 (1960).
Only Bracigliano, as the "named insured" therein, is an insured under the Phoenix policy. The Oldsmobile involved in the accident is a "non-owned automobile" as far as that policy is concerned. Since Nasarow is neither the named insured nor a relative of the named insured he does not qualify as an insured under paragraphs (b) (1) and (b) (2). If Bracigliano was driving the Oldsmobile as Nasarow's agent, Nasarow is a person legally responsible for the use of the "non-owned automobile." But he would still not qualify as an insured under paragraphs (c) (2) *546 of the Phoenix policy because the "non-owned automobile," the Oldsmobile, was owned by Nasarow.
Each defendant insurance company says that its policy does not afford coverage, contending that the collision occurred while the Oldsmobile was being "used in the automobile business" within the meaning of the following exclusion clauses appearing in the liability insurance part of each policy (Aetna relying on paragraph (g), Phoenix on paragraph (h)):
"Exclusions. This policy does not apply * * *:

* * * * * * * *
(g) to an owned automobile while used in the automobile business, but this exclusion does not apply to the named insured, a resident of the same household as the named insured, a partnership in which the named insured or such resident is a partner, or any partner, agent or employee of the named insured, such resident or partnership;
(h) to a non-owned automobile while used (1) in the automobile business by the insured or (2) in any other business or occupation of the insured except a private passenger automobile operated or occupied by the named insured or by his private chauffeur or domestic servant, or a trailer used therewith or with an owned automobile."
"Automobile business" is defined by the policy to mean "the business or occupation of selling, repairing, servicing, storing or parking automobiles."
As Mr. Justice Francis said in Mazzilli v. Accident & Casualty Ins. Co., 35 N.J. 1, 7-8 (1961):
"Solution of a problem of construction of an insurance policy must be approached with a well settled doctrine in mind. If the controlling language will support two meanings, one favorable to the insurer, and the other favorable to the insured, the interpretation sustaining coverage must be applied. Courts are bound to protect the insured to the full extent that any fair interpretation will allow. Kievit v. Loyal Protective Life Ins. Co., etc., 34 N.J. 475 (1961). Moreover, in evaluating the insurer's claim as to the meaning of the language under study, courts necessarily consider whether alternative or more precise language, if used, would have put the matter beyond reasonable question; also whether judicial decisions appear in the reports attributing a more comprehensive significance to it than that contended for by the insurer. Mahon v. American Cas. Co. of Reading, Pennsylvania, 65 N.J. Super. 148 (App. Div. 1961). Insurance contracts *547 are unipartite in character. They are prepared by the company's experts, men learned in the law of insurance who serve its interest in exercising their draftsmanship art. The result of their effort is given to the insured in printed form upon the payment of his premium. The circumstances long ago fathered the principle that doubts as to the existence of coverage must be resolved in favor of the insured. Barker v. Iowa Mut. Ins. Co., 241 N.C. 397, 85 S.E.2d 305 (Sup. Ct. 1955).
These general rules of construction have spawned a number of subsidiary ones of equally universal recognition. For example, where the policy provision under examination relates to the inclusion of persons other than the named insured within the protection afforded, a broad and liberal view is taken of the coverage extended. But, if the clause in question is one of exclusion or exception, designed to limit the protection, a strict interpretation is applied. Cal-Farm Ins. Co. v. Boisseranc, 151 Cal. App.2d 775, 312 P.2d 401, 405 (D.C. App. 1957)."
At the outset, it is at once apparent that whatever may be the proper interpretation or construction of the quoted exclusion clauses they do not apply to Nasarow. He is an insured under the Aetna policy as the "named insured" and owner of the Oldsmobile. By its express terms, the exclusion found in paragraph (g) does not apply to the "named insured."
Aetna is required to defend the negligence action on Nasarow's behalf. In fact, it has done so, even though its claim in the declaratory judgment action is that exclusion (g) applies to Nasarow.
The question of the interpretation and effect of the exclusion clauses remains, however, with respect to Bracigliano, who qualifies as an insured under both policies.
The clause contained in defendants' policies  "The policy does not apply * * * to an * * * automobile while used in the automobile business"  is a relatively new form of automobile business exclusion clause. No reported case in this State has dealt with it and it has been the subject of judicial consideration in but three reported cases outside New Jersey. McCree v. Jenning, 55 Wash.2d 725, 349 P.2d 1071 (Sup. Ct. 1960); Chavers v. St. Paul Fire & Marine Insurance Co., 188 F. Supp. 39 (Ohio *548 1960); Cherot v. United States Fidelity & Guaranty Co., 264 F.2d 767, 71 A.L.R.2d 959 (10 Cir. 1959).
Automobile liability insurance policies have in the past contained various forms of exclusion clauses referring to garages, automobile repair shops and filling stations. For the most part, the provisions of such clauses have expressly eliminated persons engaged in those businesses from those added as insureds by the omnibus clause of the policy. Judicial interpretation of the clauses differed, depending on the specific language used. See Asnis v. Bankers' Indemnity Ins. Co., 110 N.J.L. 134 (E. & A. 1933), where the court held that the exclusion clause did not apply when the garageman was riding in or driving the automobile, construing the exclusion clause to be applicable only in cases where the garageman, although not riding in the automobile, was "legally responsible" for the operation thereof; Berry v. Travelers Ins. Co., 118 N.J.L. 571 (E. & A. 1937), where the exclusion clause was held to apply to a garageman taking the insured truck to his garage for inspection and repair; Bosshardt v. Commercial Casualty Co., 124 N.J.L. 54 (E. & A. 1940), where it was held that an exclusion clause identical with that involved in Berry did not apply to a "sort of itinerant automobile mechanic," who did not operate "an automobile repair shop, a public garage, sales agency or service station" and was not "in the employ of any person or organization who did"; see also 7 Appleman Insurance Law & Practice 191, § 4372; Annotations, 47 A.L.R.2d 556 and 71 A.L.R.2d 964.
Defendants contend that Bracigliano was in the automobile business and therefore the exclusion clauses bar coverage, arguing that the exclusionary clauses in their policies are to be given the same interpretation as the clause involved in Berry v. Travelers Ins. Co., 118 N.J.L. 571 (E. & A. 1937). In Berry the policy provided:
"The unqualified word `Assured' * * * includes not only the named Assured but also any other person or organization while *549 legally using the automobile * * * provided that such use is with the permission of the named Assured * * *. The provisions of this paragraph shall not apply, however, to any person or organization, or employee thereof, operating an automobile repair shop, public garage, sales agency or service station and arising out of the operation thereof."
The court said, at page 574:
"We construe the language in the policy now before us to mean that the broad application of the word `assured' shall not extend to any person who operates an automobile repair shop, public garage, sales agency, or service station when the loss arises out of such operation."
The proofs in the instant case do establish that at the time of the accident Bracigliano was in the "automobile business," as that term is defined in the policy: "the business or occupation of * * * repairing * * * automobiles."
He and two friends had rented a garage where, outside his regular working hours, he repaired automobiles. Although most of that repair work was done either on his own automobile or those of his family or friends and he "never openly advertised that he was in the repair business," he did do repair work for others as the occasion presented itself and was paid therefor, just as he was to be paid $40 for the repair work he had undertaken to do on the Nasarow automobile.
But the clause involved in Berry differs greatly from the clauses in defendants' policies, and that case is not authority for the construction urged by defendants.
Unlike the clause in Berry, the exclusionary clauses in the liability insurance part of defendants' policies do not purport to exclude an "insured" from coverage because of his business or occupation. The exclusion relates to the use to which the automobile is being put, not to the identity or occupation of the person driving it. For, as the court said in Chavers v. St. Paul Fire & Marine Ins. Co., 188 *550 F. Supp. 39, 42 (N.D. Ohio, 1960), with respect to an exclusion clause identical with those in defendants' policies:
"Thus, the business the car was being used in, not the business or occupation of the person using the car, be he a claimant under the policy or not, is the important consideration."
The distinction is underscored by a comparison of the exclusion clauses of the liability insurance provisions (Part I) of defendants' policies with the "automobile business" exclusion clause found in the medical payment ("Expenses for Medical Services") provisions (Part II) of defendants' policies. The exclusion clause in the latter reads:
"This policy does not apply under Part II to bodily injury:

* * * * * * * *
(d) sustained by any person who is employed in the automobile business, if the accident arises out of the operation thereof and if benefits therefor are in whole or in part either payable or required to be provided under any workmen's compensation law;"
thus making the exclusion depend on the occupation or employment of the person who otherwise could claim the benefits of the medical payments coverage of the policies.
In two of the three reported cases which have considered exclusion clauses identical with those in the liability insurance part of defendants' policies, the issue presented was whether the person driving was in the "automobile business" as defined in the policy.
So in Chavers v. St. Paul Fire & Marine Ins. Co., 188 F. Supp. 39 (Ohio, 1960), where the accident happened in a restaurant parking lot, the court held that neither the restaurant nor the parking lot attendant who was driving the car was in the "automobile business."
And in Cherot v. United States Fidelity & Guaranty Co., 264 F.2d 767, 769 (10 Cir. 1959), the court, after saying that
"* * * it must be assumed that the word automobile `business' as used in the exclusionary clause means business in the ordinary *551 accepted sense  that is an undertaking engaged in with some regularity and for profit and income."
held that the driver, an automobile mechanic who had "abandoned his attempt to establish an automobile repair business" and whose "tinkering with cars for his friends was a hobby with him for which he made no charge for labor," was not in the "automobile business."
Only McCree v. Jenning, 55 Wash.2d 725, 349 P.2d 1071 (Sup. Ct. 1960), involves the issues presented here  What is the interpretation to be given the word "used" appearing in the phrase "while used (1) in the automobile business"? Is a customer's automobile in the custody or possession of an automobile repairman being used in his automobile business?
In McCree, supra, Miller, a part-time auto repairman, who was also a barber, had possession of Jenning's automobile for the purpose of making repairs. When the repairs were completed, Jenning asked Miller to bring the auto to the latter's barbershop where he would pick it up. "Miller agreed to do this, but said that it needed gas. [A Frank] Farrell, who was at the Miller home as a guest, either volunteered or was asked to take the vehicle to a gas station for this purpose. It was on this trip (and while Farrell was driving) that the accident occurred."
Hardware Mutual Casualty Company has issued a liability insurance policy to Farrell's mother covering an automobile which she owned. By its terms Farrell, as a member of his mother's family, was an "insured" for whom insurance coverage was afforded while driving a non-owned automobile. But the policy had an exclusion clause reading:
"The policy does not apply under Part I: * * * (f) to a non-owned automobile while used (1) in the automobile business by the insured * * *,"
"automobile business" being defined as it is in the policies in the instant case.
*552 The insurance company contended that:
"Farrell's liability was expressly excluded under the terms of the policy because the automobile was being `used in the automobile business' at the time."
In holding that the exclusion clause did not apply, Judge Rosellini, writing for a unanimous court said:
"The trial court construed these provisions to mean that coverage was excluded only where the non-owned automobile was being used in an automobile business in which the insured was employed or engaged. The appellant contends that the plain language of the provisions will not support such a construction. We may agree with the appellant in this respect, and yet uphold the trial court's disposition of the case, for we think it clear that for another reason, the exclusion does not apply.
The appellant appears to have overlooked the significance of the word, `used' and to have assumed that any automobile in the possession or under the control of an automobile repairman would necessarily come within the exclusion. We do not so read the exclusion.
According to the pertinent definitions in Webster's New Twentieth Century Dictionary (2d ed. 1957), the verb `to use' means `to put or bring into action or service; to employ for or apply to a given purpose.' Synonyms are `employ, exercise, treat, practice, accustom, habituate, inure.'
It would appear evident, therefore, that an automobile `used in the automobile business,' would be one which was employed for some purpose in connection with that business. For example, a tow truck, an automobile used for demonstration purposes, or a vehicle used for securing or delivering equipment and supplies would be `used in the business.' But the Jenning automobile was not turned over to Miller to be used by him for his business purposes. It was simply brought to him to be repaired.
In driving the Jenning automobile to the gas station, Farrell was not using it in the repair business, but was merely accommodating a friend, who in turn was accommodating a customer.
If there were any ambiguity in this language of the policy, we would be required to construe it in favor of the insured. Anderson & Middleton Lumber Co. v. Lumbermen's Mutual Cas. Co., 53 Wash.2d 404, 333 P.2d 938. * * *."
In view of the rules applicable to the construction of exclusion clauses, I am of the opinion that the interpretation adopted by the Supreme Court of Washington is the *553 proper interpretation of the exclusion clauses in defendants' policies.
Moreover, judicial support for that interpretation is to be found in this State in an analogous case involving an exclusion clause in a contractors' liability policy.
In Boswell v. Travelers Indemnity Co., 38 N.J. Super. 599 (App. Div. 1956), defendant had issued its "Manufacturers' and Contractors' Liability Policy" to plaintiff who was in the business of installing and repairing steam boilers. The policy covered plaintiff "for injury to or destruction of property caused by accident and arising out of hazards defined in the policy. (Coverage B)."
Plaintiff undertook to replace the tubes in two heat exchange units located in a customer's office building in New York. When the work was completed, plaintiff's employees "ran a hydrostatic test to determine if the job had been done in good, workmanlike manner. Instead of running the water through the tubes, the men by mistake ran it through the outer shell of the units" causing one of them to crack. Plaintiff had to make good the damage, at a cost of $3,580. Defendant refused reimbursement under the policy relying, inter alia, on the following exclusion clause in the policy:
"* * * [T]he policy was not to apply * * *:
`(g) under Coverage B [Property Damage Liability], to injury to or destruction of property owned, rented, occupied or used by the insured * * *.'"
In affirming a judgment for the plaintiff, Judge Goldmann, writing for the court, after discussing the rules of construction applicable to insurance contracts said:
"Turning now to the `Exclusions' clause in the policy under consideration, the term `used' may be defined in a wide variety of ways. See Great American Indemnity Co. of New York v. Saltzman, 213 F.2d 743, 746-747 (8th Cir. 1954), which explores many definitions of `use,' and where it was held that an insured who trespassed upon and wrecked an airplane was not `using' it; Challis v. Commercial Standard Ins. Co., 117 Ind. App. 180, 182, 69 N.E.2d 178, 179 (App. Ct. 1946), holding that the insured's parking lot attendant *554 who moved a customer's car was not `using' it; Hardware Mutual Cas. Co. v. Mason-Moore-Tracy, Inc., 194 F.2d 173 (2d Cir. 1952), where the insured who damaged an elevator while moving rug cleaning equipment was held to have `used' the elevator; and Lee v. Aetna Casualty & Surety Co., 178 F.2d 750 (2d Cir. 1949), a similar case.
Black's Law Dictionary (4th ed. 1951) defines `use' as (v) to convert to one's service, to avail one's self of, to employ; and (n) the fact of being used or employed habitually, usage; the purpose served; a purpose, object or end of useful or advantageous nature. The Oxford English Dictionary also defines `use' as a purpose served; a purpose, object or end for useful or advantageous nature. Webster's New International Dictionary (2d ed. 1951) defines `use' as (v) to make use of, especially habitually or customarily; to convert to one's service; to put into operation; to cause to function. `Use' has these and many other meanings. Practically every activity of mankind, as was observed in the Great American Indemnity Co. case, above, would amount to a `use' of something, in the broadest sense of that word. But the term must be considered with regard to the setting in which it is employed. It was incumbent upon defendant, as the insurer, to so word the exclusion clause of the policy (if it was to be effective) that any conceivable contact of plaintiff with a boiler in the course of repairing it would come within the word `use.' Since insurance contracts are phrased by the insurer, it is for the insurer to make them so clear that they contain no ambiguity as to their meaning; otherwise they must be construed most strongly against the insurer.
We are inclined to the view that the word `use,' as used in the exclusion clause of the policy is ambiguous. But even if it were not, we would have no trouble in holding that plaintiff was not `using' the heat exchange unit in any sense of the word. The Great American Indemnity Co., Challis, Hardware Mutual Casualty Co. and Lee cases, cited above, reinforce this position; they suggest that an insured `uses' property within the meaning of the exclusion clause only where he puts it to his own service or to the purpose for which it was ordinarily intended." At pp. 606-607.
In Challis v. Commercial Standard Ins. Co., 117 Ind. App. 180, 69 N.E.2d 178 (App. Ct. 1946), referred to in the opinion in Boswell, a policy issued to parking lot owners (the appellants) affording insurance against liability arising from the operation of the parking lot provided that:
"`The Company shall not be liable for or on account of any claim alleging such injuries and/or death: ____ Caused by the ownership, maintenance or use of a vehicle of any description ____'."
*555 While one of appellants' employees was driving a customer's parked automobile from one parking lot to another he struck and injured a pedestrian. In holding that the quoted language did not exclude coverage with respect to the accident, the court said:
"* * * The question presented * * * is whether * * * [the appellants] were engaged in the `use' of * * * [the automobile] according to the meaning of that word in the above quoted exception.

* * * * * * * *
In applying the * * * rule of construction [applicable to insurance policies] to the policy at hand the word `use' must be interpreted as meaning to put to one's own service. Appellants were merely moving the automobile in question as a part of their parking service to the owner and were not putting it to their own service."
For the foregoing reasons, it is my opinion that a customer's automobile in the custody or possession of an automobile repairman who drives it for the purpose of testing the repairs which he has made is not being used in the automobile business within the meaning of the exclusion clauses in defendants' policies.
Coverage is afforded to Bracigliano by both Aetna's and Phoenix' policies.
Both policies have "other insurance" provisions but the issue as to which policy affords "primary coverage" was not raised in either the pleadings or the pretrial order. However, at the trial the parties asked that the court also rule on that issue. Each policy provides:
"Other Insurance. If the insured has other insurance against a loss covered by Part I of this policy the company shall not be liable under this policy for a greater proportion of such loss than the applicable limit of liability stated in the declarations bears to the total applicable limit of liability of all valid and collectible insurance against such loss; provided, however, the insurance with respect to a temporary substitute automobile or non-owned automobile shall be excess insurance over any other valid and collectible insurance."
Since Phoenix' insurance is with respect to a non-owned automobile, under the settled law its insurance is only *556 excess insurance; Aetna, the owner's insurer has the primary liability. American Surety Co. of New York v. American Indemnity Co., 8 N.J. Super. 343 (Ch. Div. 1950); Cosmopolitan Mutual Ins. Co. v. Continental Casualty Co., 28 N.J. 554, 561-562 (1959).
Present judgment.